UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| ANNA FAIR, | ) | CIV. 11-5005-JLV |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | **GRANTING IN PART AND** |
| ROYAL & SUN ALLIANCE and | ) | **DENYING IN PART** |
| ARROWPOINT CAPITAL CORP., as | ) | **DEFENDANTS' MOTIONS** |
| successor in interest to | ) | **TO QUASH AND FOR** |
| ROYAL & SUN ALLIANCE, | ) | **PROTECTIVE ORDER** |
| NASH FINCH COMPANY, and | ) | [DOCKET NOS. 48 and 70] |
| SEDGWICK CMS, | ) | |
| | ) | |
| Defendants. | ) | |

**INTRODUCTION**

This matter is before the court on plaintiff Anna Fair's complaint alleging

bad faith denial of her worker's compensation insurance claim.  See Docket

No. 1.  Jurisdiction is premised on diverse citizenship of the parties and an

amount in controversy in excess of $75,000 pursuant to 28 U.S.C. § 1332.

Ms. Fair served defendants Nash Finch Company and Sedgwick CMS with a

notice of deposition and two subpoenas *duces tecum* pursuant to Fed. R. Civ. P.

30(b)(6).  These two defendants then moved the court for an order quashing

that notice of deposition, quashing one of the subpoenas *duces tecum*  and for

a protection order.  See Docket Nos. 48, 70.[1]  Ms. Fair opposes these motions.
The district court, the Honorable Jeffrey L. Viken, referred defendants' motions
to this magistrate judge for decision pursuant to 28 U.S.C. § 636(b)(1)(A).

**FACTS**

The following are facts relevant to the instant motion.  Plaintiff Anna Fair
was employed by defendant Nash Finch Company ("Nash Finch").  While so
employed on July 8, 2003, she suffered a work-related injury to her left ankle,
resulting in a recurrence of a stasis ulcer.  At the time of the injury, Nash
Finch had procured worker's compensation insurance through an insurance
policy sold to them by Royal & Sun Alliance.  Sedgwick CMS ("Sedgwick")
administered worker's compensation claims for Royal & Sun Alliance.  Ms. Fair
received worker's compensation benefits from Royal & Sun Alliance for her
ankle injury prior to August, 2009.[2]

In August, 2009, Ms. Fair required additional medical treatment for her
work-related ankle injury.  Defendants did not agree to pay for the care and

---

[1]Plaintiff served defendants with these three discovery requests on
December 21, 2011.  Defendants moved to quash the Rule 30(b)(6) deposition
on December 30, 2011, but stated in that motion that they did not object to
either of the subpoenas *duces tecum*.  Then, on January 11, 2012, defendants
moved to quash one of the subpoenas *duces tecum*.  The deadline for
responding to the subpoena is January 13, 2012.

[2]Initially, defendants disputed whether Ms. Fair's injury arose out of and
in the course of her employment and whether she was permanently and totally
disabled.  These issues were decided adversely to defendants on February 14,
2007.  See Fair v. Nash Finch Co., 2007 S.D. 16, 728 N.S.2d 623.

2

Ms. Fair's medial care provider would not provide the treatment until payment for the care was verified.  Accordingly, Ms. Fair arranged for her treatment to be covered by Medicare so that she could receive the treatment she needed. Ms. Fair was treated in September, 2009.  Medicare paid over $3,000 on Ms. Fair's medical expenses relating to her ankle for this 2009 treatment. Ms. Fair was herself responsible for just under $500 of these medical expenses.

Ms. Fair's attorney pursued payment from defendants for these medical expenses.  Defendants did not make the payment.  Ms. Fair alleges that defendants' decision not to pay was a deliberate bad faith denial of her worker's compensation claim.  Defendants allege that the failure to pay the claim was due to inadvertence rather than design.

Ms. Fair's attorney filed a petition on March 15, 2010, before the South Dakota Department of Labor in an attempt to force defendants to pay Ms. Fair's worker's compensation claim for the September, 2009, medical treatment.  Defendants answered the petition by stating that they had already paid all bills on Ms. Fair's claim and asking that Ms. Fair's petition be dismissed.

In April 2010, Ms. Fair's medical care provider turned Ms. Fair's account over to a debt collection agency, which began attempting to collect the approximately $500 from Ms. Fair that was still owed on her September, 2009, treatment bill.

3

Approximately three months after Ms. Fair's petition before the Department of Labor was filed, defendants paid in their entirety the medical expenses for Ms. Fair's September, 2009, treatment–resulting in a reimbursement of Medicare and payment of the additional $500 balance. Ms. Fair filed her complaint in this matter on January 24, 2011.

Since the lawsuit was initiated, the parties have engaged in some discovery.  The deposition of Ms. Fair has been taken.  Depositions of Cindy Weingart, Dave Oertli, Patty Nylin, Beth Iacono, and Deborragh Woods were taken.  And written discovery requests have been served and, for the most part, responded to.

On December 21, 2011, Ms. Fair's counsel served on defendants a deposition notice pursuant to Fed. R. Civ. P. 30(b)(6) and a subpoena *duces tecum*.  The deposition notice listed 18 separate and specific inquiries it wished Sedgwick to provide representatives to answer questions regarding, and 13 separate and specific inquires it wished Nash Finch to provide representatives to answer questions regarding.  The 13 topics posed for Nash Finch are identical to the first 13 topics posed for Sedgwick.  The deposition was noticed as a video deposition and set a date of January 20, 2012, for the deposition to take place.

Ms. Fair simultaneously served Sedgwick and Nash Finch with a subpoena *duces tecum* for three specific documents or sets of documents, to be

4

produced to Ms. Fair's attorney one week before the Rule 30(b)(6) deposition. Sedgwick and Nash Finch also object to one of these subpoenas *duces tecum*.

Sedgwick and Nash Finch now seek to quash the notice of deposition, quash one subpoena *duces tecum*, and they seek a protection order.  Ms. Fair resists the motions.

## DISCUSSION

### A.    Good Faith Certification

Both the Federal Rules of Civil Procedure and this district's local rules of procedure require that parties meet and confer in an attempt to resolve discovery disputes before filing discovery motions.  See Fed. R. Civ. P. 26(c)(1); DSD LR 37.1.  A certification must be part of any discovery motion and the certification must show that a good-faith effort was made to resolve disputes before filing the motion.  Id.

Defendants satisfied their duty to meet and confer prior to filing the second motion, Docket No. 70.  As to the first motion to quash and for a protective order, Docket No. 48, no such attempt was even made by defendants before filing the motion.  Defendants state that "due to the holidays, the parties have not had an opportunity to satisfy the obligations to meet and confer." See Defendants' brief at Docket No. 49, page 2.

Plaintiff's counsel represents that he was in his office working every business day over the holidays and even on some non-business days.  He was

5

never contacted by defendants' counsel regarding the subject of this discovery motion.

Had defendants attempted to contact plaintiff to resolve the discovery issues and had defendants been unable to get in touch with plaintiff, the failure to abide by Rule 26(c)(1) and Local Rule 37.1 might be excused.  But the meet-and-confer requirement is mandatory–both rules use the word "shall." And defendants made no effort to fulfill this requirement *before* filing the instant motion.  If defendants' counsel were in the office long enough to draft and file this motion, they were in the office long enough to place a telephone call or send an e-mail to plaintiff's counsel.  The court finds that defendants have not satisfied their obligation under Fed. R. Civ. P. 26(c)(1) or DSD LR 37.1 before filing this motion and that the failure to do so provides an independent ground for the denial of the motion.

However, defense counsel did contact plaintiff's counsel after filing the motion and represent that they were unable to resolve their differences. Because the merits of defendants' objections to plaintiff's discovery are likely to arise again, and because the meet-and-confer was eventually held (albeit after the motion was filed) the court addresses the merits of the motion.

**B.      Scope of Discovery in a Civil Case**

Under Fed. R. Civ. P. 30(b)(6), a party may designate a public or private corporation as the deponent and list with reasonable particularity the matters

the party wishes to examine the corporation on.  The corporation must then designate one or more persons to testify on behalf of the corporation. Defendants Sedgwick CMS and Nash Finch do not take issue with the nature of plaintiff's Rule 30(b)(6) notice.  They do not argue that Ms. Fair has failed to state with reasonable particularity the matters on which she wishes to inquire. Rather, defendants' argument against the discovery is that the discovery is not relevant and poses an undue burden.

The scope of discovery is governed by Fed. R. Civ. P. 26.  The scope described by that rule is broad:

> Unless otherwise limited by court order, the scope of discovery is as follows:  Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense–including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).

See Fed. R. Civ. P. 26(b)(1).

This broad scope of discovery under subsection (b)(1) is limited by subsection (b)(2)(C).  That subsection provides that:

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
> (i) the discovery sought is unreasonably cumulative or

7

> duplicative, or can be obtained from some other source that
> is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to
> obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery
> outweighs its likely benefit, considering the needs of the
> case, the amount in controversy, the parties' resources, the
> importance of the issues at stake in the action, and the
> importance of the discovery in resolving the issues.

See Fed. R. Civ. P. 26(b)(2)(C).

A party may move for a protective order from discovery upon a demonstration of good cause in order to protect themselves from annoyance, embarrassment, oppression, or undue burden or expense.  See Fed. R. Civ. P. 26(c)(1).  If a motion for protective order is denied, the court may order that the party provide or permit discovery.  Id. at (c)(2).  The court may award attorneys fees and expenses in connection with a motion for protective order.  Id. at (c)(3); Fed. R. Civ. P. 37(a)(5).

The scope of discovery under Rule 26(b) is extremely broad.  See 8 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2007 (2d ed. 1994) (hereinafter "Wright & Miller").   The reason for the broad scope of discovery is that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.  To that end, either party may compel the other to disgorge whatever facts he has in his possession."  8 Wright & Miller, § 2007, 96 (quoting Hickman v. Taylor, 329 U.S. 495, 507-08, 67 S. Ct.

8

385, 392, 91 L. Ed. 2d 451 (1947)).  The Federal Rules distinguish between discoverability and admissibility of evidence.  Id. at 95; see also Fed. R. Civ. P. 26(b), 32, and 33.  Therefore, the rules of evidence assume the task of keeping out incompetent, unreliable, or prejudicial evidence at trial.  These considerations are not inherent barriers to discovery, however.

The advisory committee's note to the 2000 amendments to Rule 26(b)(1) provide guidance on how courts should define the scope of discovery in a particular case:

> Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action.  The good-cause standard warranting broader discovery is meant to be flexible.
>
> The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action.  The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision.  A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action.  For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. ... In each case, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.
>
> The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. ... When judicial intervention is

9

invoked, the actual scope of discovery should be determined according to the reasonable needs of the action.  The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

See Fed. R. Civ. P. 26(b)(1) advisory committee's note.

The same advisory committee's note further clarifies that information is discoverable only if it is relevant to the claims or defenses of the case or, upon a showing of good cause, to the subject matter of the case.  Id.  "Relevancy is to be broadly construed for discovery issues and is not limited to the precise issues set out in the pleadings.  Relevancy ... encompass[es] 'any matter that could bear on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.' "  E.E.O.C. v. Woodmen of the World Life Ins. Society, 2007 WL 1217919 at *1 (D.Neb. March 15, 2007) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).  The party seeking discovery must make a "threshold showing of relevance before production of information, which does not reasonably bear on the issues in the case, is required."  Id. (citing Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1993)).  "Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe with a reasonable degree of specificity, the information they hope to obtain and its importance to their case."  Id. (citing Cervantes v. Time, Inc., 464 F.2d 986, 994 (8th Cir. 1972)).

10

Discoverable information itself need not be admissible at trial; rather, "discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence." See Fed. R. Civ. P. 26(b)(1) advisory committee's note.

Ms. Fair's only claim in this lawsuit is a claim of bad faith refusal to pay worker's compensation insurance benefits for which she requests both compensatory and punitive damages. To prove a bad faith cause of action, Ms. Fair must show that defendants had no reasonable basis for denying her worker's compensation benefits as to her September, 2009, medical care and that they acted with knowledge or a reckless disregard as to the lack of a reasonable basis for the denial of benefits. See Sawyer v. Farm Bureau Mut. Ins. Co., 2000 S.D. 144, ¶ 18, 619 N.W.2d 644, 649.

To be entitled to an award of punitive damages, Ms. Fair must show that defendants acted with malice, actual or implied. See Bertelsen v. Allstate Ins. Co., 2011 S.D. 13, ¶ 39, 796 N.W.2d 685, 698-99 (citing SDCL § 21-3-2). "Actual malice is a positive state of mind, evidenced by a positive desire and intention to injure one another, actuated by hatred or ill-will towards that person." Id. at 699 (quoting Biegler v. American Family Ins. Co., 2001 S.D. 13, ¶ 45, 621 N.W.2d 592, 605). "By contrast, presumed malice is 'malice which the law infers from or imputes to certain acts.' " Id. (quoting Harter v. Plains Ins. Co., 1998 S.D. 59, ¶ 36, 579 N.W.2d 625, 634). "Presumed malice may

11

not 'be motivated by hatred or ill-will but is present when a person acts willfully or wantonly to the injury of others.' " Id. (quoting Biegler, 2001 S.D. 13, ¶ 45, 621 N.W.2d at 605).

Among the factors considered in determining the appropriateness and amount, if any, of punitive damages to award, the degree of reprehensibility of the defendant's conduct is paramount.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003); Roth v. Farner-Bocken Co., 2003 S.D. 80, ¶48, 667 N.W.2d 651, 666.  When considering this factor, one considers whether "the harm caused was physical as opposed to economic; [whether] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [whether] the target of the conduct had financial vulnerability; [whether] the conduct involved repeated actions or was an isolated incident; and [whether] the harm was the result of intentional malice, trickery, or deceit, or mere accident."  Roth, 2003 S.D. 80, ¶ 49, 667 N.W.2d at 666 (quoting Campbell, 538 U.S. at 419).  Knowing the issues that are relevant to the claim asserted by Ms. Fair, the court turns to defendants' arguments as to relevance.

**1.     Items "a" through "h"**

In Ms. Fair's deposition notice, she listed the following topics into which she indicated she wishes to depose both Sedgwick and Nash Finch:

a.   The names of all people to whom you sent the following documents: Nash Finch 9-10, 14-15, 19-20, 22-23, 31-32, 36-37, and 56.

b.   The amount in dollars that a 10% reduced average cost per claim in 2002 would have totaled (see David Oertli deposition p. 23).

c.   The amount in dollars that "a 10% reduction in the average cost closed of IN and MO claims for 2009 for each office when compared to 2008 numbers" (Nash Finch document 10) would have totaled.

d.   The amount in dollars of the "16.5% reduction on the average paid on Indemnity claims when compared to last year at this same time."  (Nash Finch document 20).

e.   The amount in dollars of the 11.6% reduction in the Medical Only average paid on closed files in 2009 (Nash Finch document 32).

f.   The amount in dollars of the 26% reduction in the "overall average paid on indemnity claims" and the 8.4% reduction in "medical only claims" (Nash Finch document 37).

g.   The amount in dollars of the percentage reductions in "Avg Paid on Closed Indemnity % of Variance" (Nash Finch document 56).

h.   The amount in dollars of the percentage reductions in the "Avg Paid on Closed MO % of Variance" (Nash Finch document 56).

Defendants object to all of the above on the grounds of relevance.  Defendants argue that each of the above topics relates only to *closed* indemnity and medical only claims.  Defendants assert that Anna Fair's claim is an *open* claim and, therefore, not included in the statistics for average closed costs. Defendants further assert that their failure to pay Ms. Fair's September, 2009,

13

medical expenses was as a result of mere oversight, and not part of any larger claims-handling pattern extent within their organizations.

Of course, this latter is at the crux of Anna Fair's claim of bad faith. Both parties spend an inordinate amount of space in their briefs addressing the merits whether bad faith occurred in this case. Defendants' motion is not about the merits of this action. That is for another day. What defendant's motion puts in issue is whether the discovery Ms. Fair has requested is relevant to her claim.

Ms. Fair asserts that the topics are relevant to her claim. She asserts that these inquiries relate to a program instituted by defendants in 2009–the same year as Ms. Fair's unpaid medical claims--to aggressively pressure their claims handlers to close claims files and to reduce payments on claims.

Ms. Fair points out that items "a" through "h" have already been produced  by defendants in discovery or, with regard to topic "b," Ms. Fair made inquiry orally in a deposition of one of defendant's employees. However, failure to object on the basis of relevancy during a deposition does not waive that objection. See Fed. R. Civ. P. 32(d)(3)(A). As to the written discovery, defendants did interpose a relevancy objection, while at the same time producing the documents requested.

Nevertheless, the posture of discovery right now is that defendants have produced information to Ms. Fair and Ms. Fair's Rule 30(b)(6) deposition is

14

fairly characterized as simply an attempt to obtain further explanation or insight into these topics or documents which defendants have already allowed to be discovered.

Item "a" in plaintiff's Rule 30(b)(6) notice relates to documents sent by defendants regarding the alleged claim reduction program.  The names of all but four of the persons to whom the document were sent were redacted by defendants prior to producing the documents to Ms. Fair in discovery.

Ms. Fair argues that she needs to know who else the document was sent to in order to judge the size and scope of defendants' claim reduction program. This is certainly relevant to the issue of the reprehensibility of defendants' actions and whether defendants' conduct "involved repeated actions or was an isolated incident; and [whether] the harm was the result of intentional malice, trickery, or deceit, or mere accident."  Roth, 2003 S.D. 80, ¶ 49, 667 N.W.2d at 666 (quoting Campbell, 538 U.S. at 419).

The remaining topics "b" through "h" are likewise relevant.  Apparently defendants have already testified or given documents to Ms. Fair regarding percentage reductions in various claims.  Items "b" through "h" merely seek for someone at Sedgwick or Nash Finch to tell plaintiff what those percentages translate into in terms of actual dollar amounts.  This seems wholly *un*objectionable and is relevant to the same issue discussed above.

Furthermore, the work required by defendants to translate percentages into dollar amounts seems minimal.

With regard to defendants' assertion that the statistics relate to closed files whereas Ms. Fair's claim is open, Ms. Fair disputes this characterization. Ms. Fair points out that the aforementioned alleged program was instituted to reduce the amount of money defendants paid out on claims. By definition, no monies are paid out on closed claims, so the program can only have its desired effect on claims that are open–either by denying payments on those claims or by closing the files (or both). Furthermore, Ms. Fair asserts that in 2010, defendants in fact did close Ms. Fair's file.

The court returns to the governing principle regarding discovery relevancy. The discovery sought need not be admissible at trial. It need only be relevant to an issue or claim or defense that is disputed in the lawsuit. Here, Ms. Fair has adequately satisfied her burden of showing that the discovery sought in topics "a" through "h" is relevant to her claim of bad faith and request for punitive damages.

**2. Topics "i" through "k"**

In topics "i" through "k," Ms. Fair seeks to inquire into the following:

i.     How much Sedgwick paid out in 2009 on Nash Finch workers compensation claims (see David Oertli deposition p. 5-6).

    j.      The number of Sedgwick offices nationwide that administer Nash Finch worker's compensation claims (see David Oertli deposition p. 6-7).

    k.      How much of Nash Finch's worker's compensation insurance nationwide is administered by Sedgwick (see Beth Iacono deposition p. 6-8).

Defendants object to these topics on the basis of relevance, arguing again that Ms. Fair's claim was not paid due to inadvertence.  Ms. Fair argues that this is relevant to the alleged program instituted by Sedgwick to reduce the amount paid out on claims.

In this regard, it would be relevant to know what the apparent bargaining power is between Nash Finch and Sedgwick.  The old saw, "if you owe your banker $1,000, it's your problem, if you owe your banker $1 million, it's your banker's problem," comes to mind.  Was Nash Finch one of only many clients for whom Sedgwick handled claims, constituting a small percentage of Sedgwick's total business?  Or was Nash Finch the "tail that wagged the dog," accounting for a disproportionate share of Sedgwick's business?  In determining whether Nash Finch had any input or power to affect the claims handling procedures utilized by Sedgwick, the information in topics i through k is at least tangentially relevant.  The court notes that both parties are named defendants in this action, so their relative fault and power to control events relevant to the handling of Ms. Fair's claim may be relevant.

17

### 3.    Topic "l"

Plaintiff alleges that Jane Adams, Sedgwick's National Program Manager for the Nash Finch account, was a key factor in implementing the program to reduce claims payments discussed above.  Plaintiff alleges that Ms. Adams sent a number of e-mails relating to this program beginning in January, 2009.  After resounding success in reducing claims payments, according to plaintiff, Ms. Adams is alleged to have stated "I really like all the green in these columns of the report."

Plaintiff previously deposed a Sedgwick employee, Cindy Weingart, who testified that the "green" Ms. Adams referred to in her statement was not the color of United States currency, but rather that the "green" referred literally to the color on Ms. Adams' spreadsheet.  Topic "l" of plaintiff's Rule 30(b)(6) deposition requests that defendants designate someone to testify to whether "green" in Ms. Adams' statement refers literally to the color green or to the fact that money is green.

Defendants object to this as an "improper" topic for a Rule 30(b)(6) deposition, although they cite no authority in support of their objection.  More cogently, defendants point out that the subpoena *duces tecum* which accompanied plaintiff's Rule 30(b)(6) deposition notice asks defendants to produce a color copy of the actual computer screen and report referred to in

Nash Finch document 23.  Defendants have represented that they do not object to this subpoena and intend to produce the two requested documents.

Defendants' objection, really, is thus that the Rule 30(b)(6) notice is duplicative.  The court agrees.  A color copy of both the computer screen and the report will show whether the columns were literally green or not.  Anyone else's interpretation of Ms. Adams' statement is really beside the point.

The court notes that no deposition notice for Ms. Adams appears in the court's docket.  In a telephone conference regarding these motions, the parties indicated that Ms. Adams is available as a witness.  It seems Ms. Adams would be in the best position to explain her own statement in this regard.  If plaintiff wishes to specifically depose Ms. Adams, a separate deposition notice can be issued as to her.  The plaintiff will have in her possession the color copy of Ms. Adams' computer screen and report.  The court will not require defendants to produce a parade of recipients of Ms. Adams' statement to testify as to each of their own individual understandings of what Ms. Adams meant.

**4.  Topics "m" through "r"**

Topics "m" through "r" request defendants to produce a representative to testify regarding incomplete discovery responses previously made by defendants.  The topics upon which plaintiff wishes to inquire are:

    m.    Why you did not produce the e-mails between March 5, 2009, and August 17, 2009, that are part of the series of e-mails that are marked as Nash Finch 9-10, 14-15, 19-20, 22-23, 31-32, and 36-37.

n.  Why the personnel file that you produced for David Oertli runs only through 2005 (see Oertli deposition p.23).[3]

o.  Whether the personnel files you produced for Christine Jesperson, Cindy Weingart, and David Oertli are complete or incomplete, and if incomplete, what documents you failed to produce and why you failed to produce them.

p.  Why you produced incomplete billing records for Richard Travis and Jeff Shultz.

q.  Why you have failed to produce complete billing records for Richard Travis and Jeff Shultz despite plaintiff's attorney's multiple requests for them.

r.  What efforts, if any, you took to produce complete billing records for Richard Travis and Jeff Shultz.

Defendants argue that topics "m" through "r" are not proper topics for a Rule 30(b)(6) deposition and assert that the topics should be resolved "through informal resolution activities by the parties and motions practice." Defendants do not specify what type of activities or motions are appropriate to resolve these matters. Defendants do not cite any authority for their position. As the party seeking to avoid discovery, defendants have the burden of demonstrating that they have a basis for doing so if plaintiff shows that the discovery is relevant to her claim. Fed. R. Civ. P. 26(c)(1).

Ms. Fair asserts that the information is relevant. First of all, she points out that defendants have produced some documents relative to each of these

---

[3]David Oertli is asserted to have continued his employment with Sedgwick to the present day.

topics.  She wants to inquire as to each category of documents whether the production was complete or incomplete.

Second, citing McElgunn v. CUNA, 700 F. Supp. 2d 1141, 1149 (D.S.D. 2010), plaintiff asserts that evidence that an insurance company has submitted false discovery responses in a bad faith litigation is relevant to the insurance company's credibility, which is turn is relevant to the bad faith action because the jury must determine whether the company's explanation for how it handled the plaintiff's claim is credible.

Defendants point out that the discovery response in McElgunn was completely false in that the company responded that there were no documents at all, when in fact documents existed while defendants' own responses in this case are merely incomplete.  This is a distinction without a difference.

Ms. Fair has a right, at minimum, to discover if there are other documents responsive to her discovery requests that defendants have not yet produced.  This is certainly a proper topic for a Rule 30(b)(6) deposition. Defendants cannot shield themselves from producing the custodian of various categories of documents to answer questions about what documents exist. Furthermore, depending on the reason certain documents were withheld, if they were withheld, and whether it was disclosed to Ms. Fair that documents were being withheld, Ms. Fair may discover further evidence of bad faith.  At a minimum, the reason why documents were not produced may bear on the

21

defendants' credibility.  This is not only relevant, but may lead to the discovery of other relevant and admissible information.

### 5.    Subpoena *duces tecum* for "scorecards"

On December 21, 2011, Ms. Fair served defendants with a subpoena *duces tecum* requesting that they produce, on January 13, 2012, certain "scorecards" for the years 2008 and 2009 as David Oertli referenced during his deposition.  Christine Jesperson was the Sedgwick employee who was the claims handler for Anna Fair's claim.  Her immediate supervisor was Cindy Weingart.  Ms. Weingart's supervisor was David Oertli, who was the supervisor for the claims group in Minneapolis, Minnesota.

Defendants' objection to producing the "scorecards" is that they were an entirely personal metric which they assert Mr. Oertli created and kept for himself to reflect the performance of his "team."  Ms. Weingart and Ms. Jesperson were part of Oertli's "team."  Defendants also argue that the "scorecards" contain information about claims other than plaintiff's type of claim.

Ms. Fair disputes defendants' characterization of the "scorecard" as being wholly a personal creation of Oertli.  Ms. Fair has produced corporate documents from Sedgwick discussing its expectations of its operation managers, including an expectation that the manager will, at minimum, meet the target on his or her office's "scorecard."  See Docket No. 74-1.  Thus, it

22

appears every office manager would be expected to have a scorecard for his office and to meet the target on that scorecard.

Both Oertli and Weingart discussed the use of "scorecards" in how Sedgwick manages its employees.  See Docket No. 74-2, 74-3.  Ms. Weingart testified that if her diaries chronicling past-due claims–claims that have not been closed by a certain target date–or if her supervisor diaries are late, she gets "scorecarded"–something that she explained as a chart whereby her supervisor tells her "this is where you are improving, this is where you are not improving."  See Docket No. 74-3.

Plaintiff's theory of her case appears to be that defendants brought institutional pressure to bear on its employees to deny claims and close claims files.  The use of "scorecards" appears to be an instrument whereby Sedgwick manages its employees' performance in the handling of claims.  It is relevant. It is not wholly personal to Oertli.  And Oertli's scorecards are relevant because his "team" included the employee handling Ms. Fair's claim.

## C.    Undue Burden

Rule 26(b)(2) requires the court to limit discovery if it determines, for example, that the discovery sought is unreasonably cumulative or duplicative or that "the burden or expense of the proposed discovery outweighs its likely benefit..."  See Fed. R. Civ. P. 26(b)(2)(C); see also Roberts v. Shawnee Mission Ford, Inc., 352 F.3d 358, 361 (8th Cir. 2003) ("The rule vests the district court

23

with discretion to limit discovery if it determines, inter alia, the burden or expense of the proposed discovery outweighs its likely benefit."); Continental Illinois Nat'l Bank & Trust Co. of Chicago v. Caton, 136 F.R.D. 682, 684-85 (D.Kan. 1991) ("All discovery requests are a burden on the party who must respond thereto.  Unless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden.").

Several courts have determined that where the discovery requests are relevant, the fact that answering them will be burdensome and expensive is not in itself a reason for a court's refusing to order discovery which is otherwise appropriate.  See In re Folding Carton Antitrust Litigation, 83 F.R.D. 260, 265 (N.D. Ill. 1979) (stating that "[b]ecause the interrogatories themselves are relevant, the fact that answers to them will be burdensome and expensive 'is not in itself a reason for refusing to order discovery which is otherwise appropriate' "); Alexander v. Parsons, 75 F.R.D. 536, 539 (W.D. Mich. 1977) (stating that "the mere fact discovery is burdensome . . . is not a sufficient objection to such discovery, providing the information sought is relevant or may lead to the discovery of admissible evidence"); and Burns v. Imagine Films Entm't, Inc., 164 F.R.D. 589, 593 (W.D.N.Y. 1996) (determining that the fact that answering interrogatories will require the objecting party to expend considerable time, effort, and expense consulting, reviewing, and analyzing

huge volumes of documents and information is an insufficient basis for an objection).  Moreover, if discovery requests are relevant, the fact that they involve work, which may be time consuming, is not sufficient to render them objectionable.  See United States v. Nysco Labs., Inc., 26 F.R.D. 159, 161-62 (E.D.N.Y. 1960)and Rogers v. Tri-State Materials Corp., 51 F.R.D. 234, 245 (N.D. W. Va. 1970) (stating that "[i]nterrogatories, otherwise relevant, are not objectionable and oppressive simply on grounds [that] they may cause the answering party work, research and expense").

Other than to make the bald assertion that Ms. Fair's discovery requests are an "undue burden," defendants do not carry their own burden of demonstrating that responding to the discovery requests will be onerous, expensive, or require labor out of all proportion to the value of the discovery. Defendants do not explain what steps will be required to respond to the discovery.  They do not estimate the hours of labor that will be involved.  They do not estimate the expense.

The court has found that all of plaintiff's discovery requests are relevant to her claim.  As such, the burden is on defendants to show some basis for issuing a protective order, some *facts* from which the court might be able to judge whether responding to the requests will be simply "too much." Defendants have not carried their burden.

25

## CONCLUSION

Based on the foregoing, it is hereby

ORDERED that defendants' motion to quash the Rule 30(b)(6) notice and for a protective order [Docket No. 48] is denied, with the exception of topic "l," which the court grants.  The Rule 30(b)(6) deposition notice issued by plaintiff remains in full force and effect.  The parties should exercise their best efforts to hold the deposition on the date, time and location indicated in the plaintiff's notice.  It is further

ORDERED that defendants' motion to quash the subpoena *duces tecum* requesting copies of David Oertli's "scorecards" for the years 2008 and 2009 and for a protective order is denied.  Defendants shall produce the documents in the manner, at the location, and at the time and date specified in the subpoena.  It is further

ORDERED that the two motions to expedite and to stay [Dockets No. 52 and 70] are granted in part and denied in part.  The court grants the request to expedite ruling in that the court has ruled on the motions in advance of the

deadlines contained in plaintiff's discovery requests.  The requests to stay are denied as moot.

Dated January 11, 2012.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE