UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| ANNA FAIR, | ) | CIV. 11-5005-JLV |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| NASH FINCH COMPANY and | ) | |
| SEDGWICK CMS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

    A.    Anna Fair's Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Nash Finch's Workers' Compensation Insurance . . . . . . . . . 9

    C.    The "Claim Administration Performance Metric" Program . . 13

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.    Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . 17

    B.    Claims Against Nash Finch . . . . . . . . . . . . . . . . . . . . . . . 19

        1.    Whether Nash Finch Owes a Duty of Good Faith . . . . .19

            a.    Nash Finch's Worker's Compensation Insurance
                    Arrangement Prior to 2004 . . . . . . . . . . . . . . . 20

            b.    Nash Finch's Workers' Compensation Insurance
                    Arrangement After 2003 . . . . . . . . . . . . . . . . . 27

i

2.      **Whether Nash Finch is Vicariously Liable for Sedgwick's Conduct** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

3.      **Whether Nash Finch is Liable for Aiding and Abetting** 41

C.     **Claims Against Sedgwick** . . . . . . . . . . . . . . . . . . . . . . . . . . .43

1.      **Whether Sedgwick Owes Ms Fair a Duty of Good Faith** 44

2.      **Whether Sedgwick is Liable as an Agent of Nash Finch** 71

3.      **Whether Sedgwick is Liable for Aiding and Abetting** . . 75

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

**NOTICE TO THE PARTIES OF RIGHT TO OBJECT TO REPORT** . . . . . . . 77

**INTRODUCTION**

This matter is before the court on plaintiff Anna Fair's complaint alleging bad faith denial of her workers' compensation insurance claim.  See Docket No. 34.

Pending before the court is a motion for summary judgement filed by both defendants, Nash Finch Company and Sedgwick CMS.  See Docket No. 96.  The district court, the Honorable Jeffrey L. Viken, referred this motion to this magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  See Docket No. 105.

**MATERIAL FACTS**

**A.    Anna Fair's Claim**

In 2003, Anna Fair suffered an injury while carrying groceries following a shift with her employer, Nash Finch Company.  See Docket No. 99 at ¶ 1.  She filed a workers' compensation claim, which Nash Finch resisted.  The claim was litigated and the South Dakota Supreme Court entered a ruling in Ms. Fair's favor.  Id. at ¶ 2.  Following the South Dakota Supreme Court's ruling, it was understood that if Ms. Fair had any recurrence of the injury that the related medical care would be paid for by Nash Finch or its insurance company.  Id. at ¶ 3.  Ms. Fair testified during her deposition that, following the South Dakota Supreme Court's ruling, she made sure to let her treating physicians know that  further treatment of her ankle would be covered by

workers' compensation insurance.  <u>See</u> Docket No. 104-22 (Fair Depo. 11:18-25 – 12:1-14).

When Ms. Fair was initially injured, Nash Finch was covered by a workers' compensation insurance policy issued by Royal & Sun Alliance ("Royal & Sun") and (apparently) administered by Healthport.  Later, Nash Finch ended its insurance relationship with Royal & Sun and obtained insurance through Zurich.  At this time, Nash Finch hired third-party administrator Sedgwick CMS, to administer its workers' compensation claims.  Royal & Sun, Sedgwick, and Nash Finch were all originally named defendants in this lawsuit.  Ms. Fair settled her claim with Royal & Sun and it is no longer a party to this action at this time.  Nash Finch and Sedgwick are the remaining defendants.  Their relation to one another, as well as their liability to Ms. Fair, are discussed in more detail below.

Prior to August of 2009, Ms. Fair had treated with Wound Care, a wound healing center that provides individualized wound treatment plans.  <u>See</u> Docket No. 99 at ¶ 5.  Dr. Robert Preston, Ms. Fair's treating physician, or his office, would typically set up appointments at Wound Care when Ms. Fair initiated treatment, and then Ms. Fair would set up additional appointments as needed.  <u>Id.</u> at ¶ 6.  With respect to the treatment at Wound Care that occurred prior to August of 2009, the bills for treatment had gone to Ms. Fair's workers' compensation insurance carrier to be paid.  <u>Id.</u> at ¶ 7.

On or about April 30, 2009, a Sedgwick employee, claims adjuster

Christine Jesperson, attempted to contact Ms. Fair to obtain an updated phone

number.  Id. at ¶ 8.  In the April correspondence, Ms. Jesperson advised

Ms. Fair to contact her if she had any questions or needed assistance with her

claim.[1] Id. at ¶ 9.

On or about June 25, 2009, Ms. Fair's attorney wrote to Ms. Jesperson

and advised that all communications regarding Ms. Fair were to go through his

office.  See Docket No. 97-3.  Thereafter, Ms. Fair's attorney corresponded

directly with Ms. Jesperson on July 2, 2009, and August 18, 2009.  See Docket

Nos. 97-4 and 97-5.

Also on August 18, 2009, Ms. Fair went to Rapid Care to obtain

treatment from Dr. Preston for a recurrence of her ankle injury.  See Docket

No. 99 at ¶ 14.  Dr. Preston was aware that Ms. Fair's treatment was in

connection with her workers' compensation claim.  Id. at ¶ 21.  At her visit with

Dr. Preston, Ms. Fair was referred to Wound Care for further treatment.  Id. at

¶ 15.  Ms. Fair's health insurance claim forms from both the August 18, 2009,

---

[1] While Ms. Fair admits that the letter says to contact Ms. Jesperson if
she had any questions or needed assistance, Ms. Fair denies that
Ms. Jesperson ever attempted to assist with her claim.  See Docket No. 110 at
¶ 9.  Rather, Ms. Fair asserts that Ms. Jesperson was adversarial with her
throughout the claim.  Id.

visit and a subsequent visit on August 25, 2009, identify Sedgwick CMS as the responsible insurance plan.[2] See Docket Nos. 97-6 and 97-7.

On August 25, 2009, Ms. Fair's attorney wrote to Catherine Sabers and Richard Travis, the attorneys who represented Travelers[3] and Royal & Sun in Ms. Fair's earlier workers' compensation litigation. See Docket No. 97-8. The letter informed Ms. Sabers and Mr. Travis that Ms. Fair needed treatment at Wound Care, that either one or both were responsible for paying for the treatment, and that Dr. Preston refused to send Ms. Fair to Wound Care until

---

[2] It is unclear whether Ms. Fair provided this information to Rapid Care or whether the information was filled in by office staff, or whether the information was already in Rapid Care's computer system.

[3] The parties do not explain in this record what role Travelers insurance company had in the handling of Ms. Fair's workers' compensation claim. Travelers was not a named party in this action, nor was it named in the South Dakota Supreme Court opinion deciding whether Ms. Fair's injury was "work related." See Fair v. Nash Finch Co. and Royal & Son Alliance, 2007 S.D. 16, 728 N.W.2d 623. Richard Travis is listed as the attorney for both Nash Finch and for Royal & Sun in the South Dakota Supreme Court opinion. Id.

the coverage issue was resolved.[4]  Id.   This letter was not sent to

Ms. Jesperson or anyone else at Sedgwick.[5]  See Docket No. 99 at ¶ 24.

Ms. Fair testified during her deposition that she did not recall either

Dr. Preston or anyone at Wound Care telling her directly that they would not

treat Ms. Fair unless workers' compensation had pre-approved the treatment.

---

[4] Regarding the letters authored by Ms. Fair's attorney, James D. Leach, indicating that Dr. Preston refused to send Ms. Fair to Wound Care until the coverage issue was resolved, Nash Finch asserts that they are improper evidence and that this court should disregard them.  Nash Finch asserts that Ms. Fair's attorney cannot simultaneously serve as her attorney and as a witness on her behalf.

Under the Rules of Professional Conduct:

(a)    A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
    (1)    the testimony relates to an uncontested issue;
    (2)    the testimony relates to the nature and value of legal services rendered in the case; or
    (3)    disqualification of the lawyer would work substantial hardship on the client; or
    (4)    except as otherwise provided by statute
(b)    A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9

SDCL 16-18 App, Rules of Prof. Conduct, Rule 3.7.

Here, because Attorney Leach is the author of these letters, the substance of which is in dispute, Mr. Leach may be required to testify at trial concerning them.  The court trusts that Attorney Leach understands the rules of professional conduct and that any issue regarding representation of Ms. Fair will be resolved prior to trial.

[5] Mr. Travis later forwarded this letter to Ms. Jesperson.

Id. at ¶ 20.  However, Ms. Fair also testified that she "pretty much" knew "you had to get insurance approval to be treated."  See Docket No. 97-22 at 3-6.

On August 27, 2009, Richard Travis, counsel for Royal & Sun, e-mailed counsel for Ms. Fair and indicated that he had retrieved the file from storage and forwarded the file and accompanying documents to Ms. Jespersen, the Sedgwick claims handler that he had worked with when the file was active.  See Docket No. 99 at ¶ 25.

Also on August 27, 2009, Ms. Fair's attorney wrote to Dr. Preston and advised:  "Since Anna has Medicare coverage, Wound Care is going to get paid one way or another, even if coverage under workers' compensation is wrongfully denied . . . I can provide the administrators at Wound Care with any necessary information about workers' compensation carriers."  See Docket No. 104-10.  This letter was not sent to Ms. Jesperson or anyone else at Sedgwick.  See Docket No. 99 at ¶ 27.

On August 31, 2009, Ms. Fair's attorney advised both Ms. Sabers and Mr. Travis by e-mail that because neither of the insurers, Travelers nor Royal & Sun, had agreed to pay for Ms. Fair's treatment at Wound Care that Ms. Fair would have Wound Care bill Medicare for the treatment.  See Docket No. 104-11.  Ms. Fair's attorney noted that although the treatment would initially be billed to Medicare, one or both of the insurers would need to pay this.  Id.  While this e-mail was not sent to Ms. Jesperson, the Sedgwick claims handler

working Ms. Fair's case, it was sent to Mr. Travis, the attorney who had represented both Nash Finch and Sedgwick.[6]

On September 2, 2009, Ms. Fair had an initial evaluation of her recurring injury at Wound Care. See Docket No. 104-12. The bill for this evaluation was sent to Medicare. On September 3, 2009, Ms. Fair was treated at Rapid Care, where Sedgwick CMS was identified as the responsible party to the pay the bill. Id. at 104-13.

The defendants assert that Ms. Jesperson did not read the communications that came from Mr. Travis carefully enough to realize that Ms. Fair was treating at two different facilities, Rapid Care and Wound Care. See Docket No. 99 at ¶ 33. The defendants assert that when Ms. Jesperson received the August 25, 2009, letter from Ms. Fair' attorney, she assumed that Ms. Fair would be treated and expected bills to arrive. Id. at ¶ 34. Defendants assert that this is apparent because Ms. Jesperson paid the Rapid Care bills as they were received. Id. at ¶ 35.

Furthermore, defendants assert that Ms. Jesperson did not know that Rapid Care and Wound Care were different treating facilities. Id. at ¶ 36. Ms. Fair disputes these facts and asserts that Ms. Jesperson was well aware that Rapid Care and Wound Care were different entities because Ms. Jesperson

---

[6] Richard Travis represented both Nash Finch and Sedgwick through November of 2010.

had paid bills from both entities in the past.  <u>See</u> Docket No. 110 at ¶ 36.

Furthermore, Ms. Fair noted that Ms. Jesperson admitted that if she had read

her e-mail, she would have known that they two were different entities.  <u>See</u>

Docket No. 104-23 (Jesperson Depo. at 28:23 – 29:24).

On September 28, 2009, Ms. Jesperson documented in her claims notes

for Ms. Fair that reasonably related medical bills would be covered by

Sedgwick.  <u>See</u> Docket No. 104-14.  Subsequently, all bills that were received

by Sedgwick for Ms. Fair's treatment at Rapid Care were paid.  <u>Id.</u> at 104-15.

The bills from Wound Care were not paid at that time.

The defendants assert that the Wound Care bills were not paid by

Sedgwick in the fall of 2009 as a result of Ms. Fair's attorney's directive that

Wound Care bill Medicare.  <u>See</u> Docket No. 99 at ¶ 39.  Ms. Fair disputes this

fact and asserts that the bills were not paid because Sedgwick ignored the e-

mails dated August 25, 2009, and August 31, 2009, which set forth the reason

for billing Medicare and also indicated that the bills should be covered by the

workers' compensation insurer.  <u>See</u> Docket No. 110 at ¶ 39.  Although

Mr. Travis, counsel for Sedgwick, and Ms. Jesperson, the Sedgwick claims

handler, both received e-mails from Ms. Fair's attorney regarding the coverage

issue, neither Ms. Fair nor her attorney ever spoke to Ms. Jesperson to ask

why Sedgwick had not contacted Wound Care to assume responsibility for the

medical bills that were being submitted to Medicare.  See Docket No. 104-22 (Fair Depo. at 22:12 – 26:25).

In March of 2010, Ms. Fair filed a petition with the South Dakota Department of Labor alleging that the responsible insurer did not take action or deny her claim.  See Docket No. 104-16.  The defendants disputed this claim.  See Docket No. 104-18.  The defendants assert that it was only after the petition for Hearing was served that Ms. Jesperson became aware that Ms. Fair's Wound Care expenses had been paid by Medicare.  See Docket No. 99 at ¶ 43.  Ms. Fair disputes this claim.  Sometime after Ms. Fair filed her petition, Ms. Jesperson took action to reimburse Medicare for Ms. Fair's medical bills at Wound Care and to notify Wound Care that Sedgwick was the responsible party for related treatment.  See Docket No. 104-17.  Ultimately, Ms. Fair's petition was dismissed as all workers' compensations benefits had been paid. See Docket No. 104-19.

B.     **Nash Finch Company's Workers' Compensation Insurance**

For the policy period beginning on January 1, 2003, and extending to January 1, 2004, Nash Finch Company purchased workers' compensation insurance from Royal & Sun.  See Docket No. 98 at ¶ 4.  The policy purchased by Nash Finch contained a one million dollar liability limit.  See Docket No. 98-1 at 1.  However, the policy also contained a large deductible endorsement which set a $500,000 deductible per occurrence.  See id. at 81.  Under this

agreement, Nash Finch would be responsible for the first $500,000 in any single workers' compensation claim made by an employee.[7] Id.

Although under the policy Nash Finch had a large deductible, the policy provided that Royal & Sun was responsible for paying whatever benefits were owed:

> B.    How The Deductible Applies
>
> 1.    We will pay benefits and damages that you are required to pay under this policy. We will only seek reimbursement for those amounts, including the appropriate amount of "allocated loss adjustment expense," that are within the applicable deductible shown above . . . .

Id. Therefore, under the Royal & Sun policy, the obligation to pay workers' compensation benefits was to remain with Royal & Sun, who was then to seek reimbursement from Nash Finch for any amount that would have been covered under the policy deductible. See id.

---

[7] Ms. Fair asserts that this policy arrangement amounts to a "fronting" policy in which Nash Finch essentially functioned as a self-insurer. Ms. Fair argues that a $500,000 deductible would be exceeded only in a rare workers' compensation claim, making Nash Finch financially responsible for the vast majority of workers' compensation claims. See Docket No. 110 at ¶ 47.

Nash Finch is not recognized as a self-insured company by the South Dakota Department of Labor, which lists on its website those companies that have elected to self-insure and have met the statutory requirements. See Docket No. 98 at ¶ 8. Nash Finch has also not sought nor obtained a certificate of exemption under SDCL § 62-5-2 from the South Dakota Department of Labor, which relieves the employer of the obligation to purchase workers' compensation insurance. Id. at ¶¶ 3-7.

In 2004, Nash Finch switched to an "unbundled program[8] with Zurich-American Insurance Group ('Zurich') and utilized Sedgwick as its third-party administrator." [9] See Docket No. 130 at 2. After Nash Finch switched to Zurich to provide insurance coverage under an unbundled program, Nash Finch hired and signed an agreement with Sedgwick in which Sedgwick would act as the third-party administrator. During this switch, the open workers' compensation claims, or "Takeover Claims," currently being handled by Royal & Sun were transferred to Sedgwick to be handled by Sedgwick going forward.

---

[8] Nash Finch asserts that an employer has the option to purchase either a "bundled program" or an "unbundled program" through its insurer. See Docket No. 130 at 2. With a "bundled program," Nash Finch asserts that the "employer buys insurance from a carrier and the carrier manages all aspects of the performance required under the policy, including but not limited to: filing state reports, issuing certificates of insurance, administering claims, and paying medical and indemnity benefits. Id. Nash Finch asserts that under an "unbundled program," the "employer purchases the insurance policy from the carrier and, with the carrier's approval, negotiates a separate contract with an authorized third-party claim administrator to manage claim administration. The arrangement facilitates administration of the claims within an insured employer's deductible." Id.

[9] Sedgwick was not involved with the handling of Nash Finch workers' compensation claims until 2004, when Nash Finch switched to an unbundled program with Zurich. See Docket No. 130 at 2. After Nash Finch switched to an unbundled policy with Zurich and entered into a separate contract with Sedgwick as the third-party claim administrator, Royal & Sun noted that "Healthport has been programmed to reject medical bills for this employer as of 7/15/04. The rejected medical bills should be returned to the provider advising them to resubmit their bill to Sedgwick." See Docket No. 130-2. It is presumed that Healthport is an administrator for Royal & Sun.

Sedgwick handled those takeover claims under a contract to which both Royal & Sun and Nash Finch were signatories. Nash Finch asserts that Sedgwick, Nash Finch, and Royal & Sun had an agreement that Sedgwick would administer these Nash Finch takeover claims that remained open at the end of the Royal & Sun policy period in 2003. Thus, regarding the takeover claims only, Sedgwick worked with both Royal & Sun and Nash Finch. Ms. Fair's claim was included in these takeover claims. After the takeover claims were transferred, Royal & Sun remained responsible for Anna Fair's claim, but the method of payment of the claims changed. Instead of Royal & Sun paying the claims initially, subject to reimbursement by Nash Finch, Nash Finch essentially paid the claims directly by giving Sedgwick the money necessary to do so in a deposit account.

Royal & Sun sent a "Notification of Claim Transfer" to Nash Finch that indicated that Royal & Sun's coverage for Nash Finch expired on January 1, 2004, and that Royal & Sun, per Nash Finch's request, would transfer all open workers' compensation claims as well as claims closed in the past twelve months to Sedgwick. See Docket No. 130-2. Royal & Sun's notification indicated that "[Royal & Sun] will be providing the original claim file with no copies retained locally." Id. After January 1, 2004, Sedgwick was responsible for administering the Royal & Sun Takeover Claims, including Ms. Fair's claim. This continued to be true through 2009.

The 2009 payments to Ms. Fair's medical care providers were made from a Sedgwick client banking account. The deposits in this account came entirely from Nash Finch and were for payment of claims that fell within the $500,000 deductible. Thus, beginning in 2004, Sedgwick did not advance its own funds in order to pay workers' compensation claims on Nash Finch's behalf; instead Sedgwick made use of funds provided by Nash Finch itself to pay those claims. Sedgwick makes payments from this client account, which is entirely funded by Nash Finch, until such time that the deductible is reached, after which the carrier (Zurich/Sedgwick) pays the medical expenses submitted.

## C.     The "Claim Administration Performance Metric" Program

In January of 2009, Nancy Adams, Director of Client Services for Sedgwick, sent an e-mail to several individuals, including Cindy Weingart, David Oertli, Patty Nylin, and Beth Iacono.[10] See Docket No. 58-15. The e-mail explained that Sedgwick was setting a goal of a 10% reduction in the average cost of indemnity and medical only claims for 2009 when compared to 2008 costs. Id. Ms. Adams noted that the statistics would be reviewed at the end of each quarter and teams who had the highest percentage of cost reduction would be recognized. Id. Ms. Adams sent a similar e-mail in February in which she noted: "[i]n January overall we exceeded the 100% closing ratio

---

[10] Cindy Weingart and David Oertli are employees of Sedgwick. Patty Nylin and Beth Iacono are employees of Nash Finch.

goal." See Docket No. 58-16.  In the same e-mail she asked the Denver and Hunt Valley offices to review the pending claims in their respective offices and determine what needed to be done to move the pending claims to closure.  Id.

In March of 2009, Ms. Adams sent another e-mail noting:  "this month we are able to report a 16.5% reduction in the average paid on Indemnity claims when compared to last year at this same time."  See Docket No. 58-17. In April of 2009, another e-mail was sent noting that there was a "14.6% reduction in the average paid on Indemnity claims" when compared to the previous year.  See Docket No. 111-10.  The same e-mail singled out the Minneapolis office for having a 25% reduction in the average cost of indemnity claims and an 8% reduction in the medical only claims.  Id.  It also mentioned Christine Jesperson by name for her work in reaching these goals. Id. Additional e-mails were sent out which reinforced the 10% reduction goal and encouraged supervisors to work with their employees in reaching the goals. See Docket Nos. 58-18 through 58-20.  Sedgwick reduced its payments on Nash Finch's workers' compensation files every single month during 2009 as compared to the previous year.  See Docket No. 58-21.

Ms. Adams provided an affidavit explaining that the purpose of the e-mails that she authored and sent out was to "increase compliance with Sedgwick's best practices, and document compliance with Sedgwick's best practices."  See Docket No. 119 at ¶ 3.  Ms. Adams' affidavit further states that

the "e-mails were tied in with Sedgwick's performance metric, which was designed to measure the cost of closed claims." Id.  Ms. Adams states that she was "trying to emphasize that claims examiners should utilize the proper processes for administering claims instead of going outside those parameters and increasing Sedgwick's costs." Id. at ¶ 4.  "Through the performance metric, Sedgwick was trying to drive claims to final resolution quickly by getting injured workers the proper treatment and returning them to work as quickly as possible." Id. at ¶ 5.

Ms. Adams asserts in her affidavit that Ms. Fair's assertion that the e-mails were designed to encourage claims handlers to reduce claims payments are inaccurate." Id. at ¶ 7.  Rather, Ms. Adams notes that "the performance metric was designed to emphasize savings through the use of the networks available to Sedgwick for things such as the purchase of pharmaceuticals, hiring Independent Medical Examiners, securing nurse managers, and so forth." Id. at ¶ 8.  Ms. Adams asserts that at no time did she "encourage Sedgwick's employees to deny or ignore claims in order to lower costs." Id. at ¶ 8.

Additionally, David Oertli, Director of Claims for Sedgwick, testified during his deposition that the Sedgwick performance metrics and figures reported in Ms. Adams' e-mails concerned statistics related to closed claims. See Docket No. 64-25 at 2 (Oertle Depo. 37:11-16).  Mr. Oertli testified that

15

Ms. Fair's claim was not closed and that it remains open.  Id.  In addition,

Mr. Oertli testified that the point of the 10% reduction goal was to "attempt to

control costs as it related to their program through the use of our cost control

vendors and pharmacy vendors, . . . and our return to work management,

those types of things that we do as a third-party administrator."  See Docket

No. 126-4 at 2 (Oertli Depo. 27:24 – 28:7).

Ms. Fair now seeks to recover against Nash Finch and Sedgwick,

asserting that the defendants handled her workers' compensation claims in

bad faith.  See Docket No. 34.  Nash Finch asserts in its motion for summary

judgment that it is not a self-insured employer, and therefore does not owe a

duty of good faith and fair dealing to Ms. Fair.  Sedgwick asserts that, as the

third-party administrator, it is not subject to a duty of good faith and fair

dealing, as alleged by Ms. Fair.  As a result, both Nash Finch and Sedgwick

assert that they are entitled to judgment as a matter of law.

Ms. Fair asserts that Nash Finch is liable under three theories as to

which there are genuine issues of material fact:  (1) that Nash Finch owed a

duty of good faith and that it breached its duty of good faith; (2) that Nash

Finch is vicariously liability for the bad faith denial of Ms. Fair's claim by

Sedgwick; and (3) that Nash Finch is liable for aiding and abetting Sedgwick's

bad faith denial of Ms. Fair's claim.

Ms. Fair asserts that Sedgwick is liable under three theories as to which there are issues of material fact:  (1) that Sedgwick owed Ms. Fair a duty of good faith and that it breached that duty; (2) that Sedgwick is liable as an agent of Nash Finch; and (3) that Sedgwick is liable for aiding and abetting Nash Finch's conduct.  Ms. Fair also asserts that Nash Finch and Sedgwick lacked a reasonable basis to deny or fail to process her claims and that Sedgwick had an improper claims reductions program which raises issues of genuine fact as to why Ms. Fair's claims were not paid.

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law."  In determining whether summary judgment should issue, the court views the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).

Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts,

by affidavit or other evidence, showing that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); FED. R. CIV. P. 56(e)(each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)). In determining whether a genuine issue of material fact exists, the court views the evidence presented in light of which party has the burden of proof under the underlying substantive law. Id. Summary judgment will not lie if there is a genuine dispute as to a material fact – that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

The substantive law identifies which facts are "material" for purposes of a motion for summary judgment. Anderson, 477 U.S. at 247. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248 (citing 10A Charles A. Wright, Arthur Miller, & Mary Ann Kane, FEDERAL PRACTICE AND PROCEDURE § 2725, pp. 93-95 (1983)). The Supreme Court has further explained that:

> the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved *conclusively* in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

Anderson, 477 U.S. at 248-49 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89 (1968)) (emphasis added). Essentially, the

availability of summary judgment turns on whether a proper jury question is presented.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250.

**B.    Claims Against Nash Finch**

Nash Finch asserts that it is not a self-insured employer, and therefore does not owe a duty of good faith and fair dealing to Ms. Fair.  Ms. Fair asserts that Nash Finch is liable under three theories:  (1) breaching its duty of good faith; (2) vicarious liability based on the conduct of Sedgwick; and (3) aiding and abetting Sedgwick.  Ms. Fair also asserts that, with regards to these theories of liability, there are questions of material fact which, when viewed in the light most favorable to Ms. Fair, preclude summary judgment.

**1.    Whether Nash Finch Owes Ms. Fair a Duty of Good Faith**

South Dakota recognizes a cause of action for bad faith in failing to pay a workers' compensation claim.  See In re Certification of a Question of Law (Champion v. U.S. Fidelity & Guar. Co.), 399 N.W.2d 320, 322 (S.D. 1987).  To prove bad faith on the part of an insurer, a plaintiff must prove:  (1) that a claim was denied or benefits withheld without a reasonable basis and (2) knowledge or reckless disregard of the lack of a reasonable basis for the denial.

Stene v. State Farm Mut. Auto. Ins. Co., 583 N.W.2d 399, 402 (S.D. 1998);

Walz v. Fireman's Fund Ins. Co., 556 N.W.2d 68, 70 (S.D. 1996). Additionally,

both parties agree that the holding in Champion was extended to cover "self-

insured employers." See Gilchrist v. Trail King Indus., Inc., 2000 SD 67, 612

N.W.2d 10. "Whether a duty exists in a case of tort liability is a matter of law

for the courts to determine." Doe v. Lennox Sch. Dist. No. 41-4, 329 F.Supp.2d

1063, 1070 (D.S.D. 2003).

In this case, Nash Finch is the employer rather than an insurance

company. However, Ms. Fair asserts that Nash Finch is self-insured and that

the workers' compensation policy purchased by Nash Finch was merely a front.

Thus, to determine whether Nash Finch owes a duty of good faith to Ms. Fair, it

must first be determined whether Nash Finch is self-insured.

### a. The Arrangement with Royal & Sun Alliance Prior to 2004

There are two periods of insurance which the court must examine in

order to assess Ms. Fair's claim–the period when Nash Finch had insurance

through Royal & Sun and the latter period when it was insured through Zurich

and Royal & Sun assigned its open claims to Sedgwick. As to the former

period, Ms. Fair argues that although Nash Finch retained insurance through

Royal & Sun (and its successor in interest, Arrow Capital Corporation), that

Nash Finch did so merely as a "front."

Nash Finch purchased a workers' compensation insurance policy from Royal & Sun with a $1,000,000 policy limit. <u>See</u> Docket No. 98-1 at 1. Under the Royal & Sun workers' compensation policy, Nash Finch had a $500,000 deductible per occurrence. <u>Id.</u> at 83. Ms. Fair asserts that because this $500,000 deductible would be exceeded only in a rare workers' compensation claim, that Nash Finch essentially remains self-insured for the vast majority of workers' compensation claims. Ms. Fair argues that Nash Finch's workers' compensation insurance is nominal, not real. The South Dakota Supreme Court has never had the occasion to discuss or decide a case involving a "fronting policy."

"A 'fronting policy' is an insurance term wherein the corporation is renting an insurance company's licensing and filing capabilities in a particular state or states." <u>Dirksen v. Philpot</u>, 2003 WL 21949733, *6 (Ohio Ct. App. 2003). Stated another way, "[t]he term 'fronting arrangement' refers to the use of an insurer to issue an insurance policy on behalf of a self-insured enterprise or a captive insurer without the intention that the insurer will bear any of the risk." 1-1 Appleman on Insurance § 1.09[4] (2012). Under a fronting arrangement, the "risk is transferred back to the self-insured enterprise or the captive through a deductible that is equal to the policy limits, an indemnity agreement, or a reinsurance agreement. The risk assumed by the fronting company (the insurer) is actually a credit risk devolving from the fronting

company's obligation to honor the obligations imposed by the policy if the self-insured enterprise or the captive fails to indemnify it under the indemnity or reinsurance agreement." Id.

In Dirksen, the court was asked to determine whether a corporation was self-insured under a "fronting" policy. See Dirksen, 2003 WL 21949733 at * 6-7. The court noted that "in order to determine whether a corporation is self-insured, the court must look to who bears the risk of loss." Id. at *6. "While insurance shifts the risk of loss from the insured to the insurer, self-insurance involves no risk-shifting." Id. In Dirksen, the policy in question was an automobile policy with a $1,000,000 policy limit and a $250,000 deductible. Id. at *7. The appellant argued that the corporation was essentially self-insured due to the high deductible. Id. However, the court noted that "the key to determining whether a party is self-insured is to determine who retains the risk of loss." Id. "In this situation, although [the corporation] retained the risk of loss for the first $250,000, [the insurer] held a risk of loss of $750,000. Clearly, this was not a situation in which the risk of loss never left the corporation." Id. Thus, the court held that the corporation was not self-insured under a fronting policy. See id.

Ms. Fair cites multiple cases deciding issues regarding "fronting" policies. However, in several of her cited cases, the deductible matched the policy limits. See Air Liquide America Corp. v. Cont'l Cas. Co., 217 F.3d 1272, 1274 (10th

Cir. 2000) ($1,000,000 automobile policy limit with a $1,000,000 deductible); Chicago Ins. Co. v. Travelers Ins. Co., 967 S.W.2d 35, 35 (Ky. App. 1997) ($1,000,000 commercial liability policy with a $1,000,000 deductible); Old Republic Ins. Co. v. Horn, 2010 WL 3608323, *1 (M.D. N.C. 2010) ($3,000,000 automobile policy limit with a $3,000,000 deductible). These cases are examples of true "fronting" policies where the risk of loss never transferred from the insured to the insurance company. These cases are inapposite to the current situation where the deductible does not match the policy limit.

Ms. Fair also cites Hubbard v. Liberty Mutual Ins. Co., Seventh Judicial Circuit (Civ. 02-889), in support of her position that summary judgment should be denied on the basis that the insurance policy obtained by Nash Finch was merely a front. In Hubbard, the plaintiff was injured during the course of her employment and sued the insurance company and her employer for insurance bad faith. The employer's insurance policy contained a $250,000 deductible. The employer then moved for summary judgment on the grounds that it was not an insurer or a self-insurer. The Seventh Judicial Circuit entered a very short written order denying summary judgment stating: "the Court finds material issues of fact are present." The court did not discuss what those material facts were nor whether they were related to the insurance policy. Thus, Ms. Fair's reliance on Hubbard is misplaced as it offers little in the way of support for her position.

Finally, Ms. Fair cites <u>Arp v. AON/Combined Ins. Co.</u>, 300 F.3d 913 (8th Cir. 2002), in support of her position. In <u>Arp</u>, an employee sued his employer for bad faith in handling his workers' compensation claims. The employer had an insurance policy with a $500,000 deductible.[11] The court noted in a footnote that the employer was "self-insured for workers' compensation up to $500,000." <u>Id.</u> at 915, n.1. The court has reviewed the <u>Arp</u> opinion and also the related district court docket and finds that the issues that are being contested in this case were not at issue in <u>Arp</u>. The parties in the <u>Arp</u> litigation were not disputing whether the employer was self-insured under a fronting policy. Rather, the employer in <u>Arp</u> admitted to being self-insured. This is exactly contrary to Nash Finch's position in the current action. Thus, <u>Arp</u> does not provided meaningful analysis of the issue now before the court.

Contrary to Ms. Fair's position, Nash Finch asserts that it chose a workers' compensation policy that is expressly authorized by South Dakota law. Under SDCL § 62-5-18:

> Any employer may agree, as a condition of the employer's contract for the insurance of compensation and benefits as provided in Title 62, to pay an amount specified in the contract per claim toward the total amount of any claim payable under the workers' compensation. The amount of premium to be paid by an employer who selects a policy with a deductible shall be reduced based upon a rating schedule or rating plan filed with and approved by the director of insurance.

---

[11] The court did not state the actual policy limit. However, it did note that claims exceeding $500,000 were paid by the insurance company. Thus, it is apparent that the deductible did not match the policy limits.

Administration of claims shall remain with the insurer as provided in the terms and conditions of its policy.

Additionally, under SDCL § 62-5-20:

> If an insured employer chooses a deductible, the insured employer is liable for the amount of the deductible paid for each claim of injury suffered by an employer. The insurer shall pay the entire cost of the employee's loss and then seek reimbursement from the insured employer for the amount of the deductible.

In this case, Nash Finch's workers' compensation policy indicates that

Royal & Sun was contractually obligated to pay the benefits owed on any claim

and was only then to seek reimbursement from Nash Finch for amounts

covered by the applicable deductible:

> B. How the Deductible Applies
> 1. We will pay benefits and damages that you are required to pay under this policy. We will only seek reimbursement for those amounts, including the appropriate amount of "allocated loss adjustment expense," that are within the applicable deductible shown above.
> 2. We will advance all or part of the deductible amount to effect settlement of any claim, proceeding or suit.
> 3. You will reimburse us promptly for any deductible amounts we have advanced.
> 4. The Each Workers' Compensation Deductible is the most you will pay for benefits required of you by the Workers' Compensation Law (Under PART ONE or PART THREE) resulting from one "occurrence."

See Docket No. 98-1 at 81. This provision of the workers' compensation policy

appears to conform with the statutory requirements of South Dakota law

quoted above.

However, even with the evidence that Nash Finch appears to have purchased a policy that conforms to South Dakota law, Ms. Fair asserts that Nash Finch did so merely to avoid complying with the South Dakota requirements to self-insure.[12] Ms. Fair asserts that even though the workers' compensation policy indicates that Royal & Sun was obligated to pay the benefits under the policy and then seek reimbursement from Nash Finch that Nash Finch hired Sedgwick to administer its claims, made decisions regarding how those claims were administered, and paid Ms. Fair's claims using their own funds and without going through Royal & Sun. However, this assertion relates to the period of time *after* Nash Finch switched to Zurich and hired Sedgwick to administer its claims.

Ms. Fair has provided no evidence that, prior to the time that Nash Finch became insured by Zurich, the insurance policy between Nash Finch and Royal & Sun was a fronting policy. As noted above, "the key to determining whether a party is self-insured is to determine who retains the risk of loss." See Dirksen, 2003 WL 21949733 at *7. Prior to 2004, it is clear that Royal & Sun retained the risk of loss. Royal & Sun, or their third-party administrator, paid the bills associated with a claim pursuant to the insurance agreement and then sought reimbursement from Nash Finch for amounts up to the deductible. Because Royal & Sun was paying claims with its own money, there was risk to

---

[12] SDCL § 62-5-5 set forth the statutory requirements for self-insurance.

Royal & Sun:  there was always a chance Nash Finch would refuse to

reimburse Royal & Sun in whole or in part.

When Nash Finch switched to an unbundled program with Zurich, Royal

& Sun sent a notification of claim transfer and indicated that:

> Healthport has been programmed to reject medical bills for this
> employer as of 07/15/04.  The rejected medical bills should be
> returned to the provider advising them to resubmit their bill to
> Sedgwick. CSO will make changes in the handling office code and
> payment indicators which will be effective 08/01/04 to prevent
> additional payments from being made in error on theses claims.

See Docket No. 130-2.  Thus, up until 2004, Nash Finch and Royal & Sun

appeared to perform their various obligations pursuant to the insurance policy,

with Royal & Sun paying workers' compensation benefits and then seeking

reimbursement from Nash Finch.  Under this arrangement, there was a risk of

loss that transferred to Royal & Sun.  Therefore, the court finds that prior to

2004, Nash Finch was not self-insured under a fronting policy.

### b.    The Arrangement with Sedgwick After 2003

In 2004, Nash Finch switched from Royal & Sun to an unbundled

program with Zurich.  After Nash Finch switched to Zurich to provide

insurance coverage under an unbundled program, Nash Finch hired and

signed an agreement with Sedgwick in which Sedgwick would act as the third-

party administrator.  The existing open workers' compensation claims under

the Royal & Sun policy, dubbed the "takeover claims," were transferred from

Royal & Sun to Sedgwick to be handled by Sedgwick going forward.

Sedgwick handled those takeover claims under a contract entered into by both Royal & Sun and Nash Finch. Nash Finch asserts that Sedgwick, Nash Finch, and Royal & Sun had an agreement that Sedgwick would administer these Nash Finch takeover claims that remained open at the end of the Royal & Sun policy period in 2003. Thus, regarding the takeover claims only, Sedgwick worked with both Royal & Sun and Nash Finch. Ms. Fair's claim was included in these takeover claims.

After the takeover claims were transferred, Royal & Sun remained responsible for Anna Fair's claim, but the method of payment of the claims changed. Instead of Royal & Sun paying the claims initially, subject to reimbursement by Nash Finch, Nash Finch essentially paid the claims directly by giving Sedgwick the money necessary to do so.[13]

Nash Finch admits that it funded entirely the Sedgwick bank account from which Sedgwick paid Nash Finch's workers' compensation claims. Nash Finch asserts it did this under an unbundled insurance policy which permits the employer to hire its own third-party administrator to handle workers' compensation claims.

---

[13] Royal & Sun's obligation for the takeover claims would only have come into play once the $500,000 deductible on a single claim was met. Then Royal & Sun would have had to pay any amounts owing on the claim above that $500,000 benchmark.

It appears that since 2004, at least with regards to Ms. Fair's claims, Nash Finch never involved an insurance company. An entry on Sedgwick's file for Ms. Fair states: "[w]e discussed that Patty[14] wants all the medical covered under Sedgwick. There is no advantage to share with Travelers because it is all Nash's money. We will notify Travelers they can close their file."[15] See Docket No. 111-5 at 3 (Weingart Depo. 12: 17-22). Another entry states: "I spoke with Patty Nylin 4/15/10 following my talks with attorney Leach and attorney Travis. Patty okayed assignment of attorney Travis to okay the petition. Patty again stated that all bills related to this injury will only be covered under this claim and not to be shared with Travelers. There is no advantage to having Travelers pay a portion since it is all Nash's money." Id. (Weingart Depo. 13:10-16).

According to the deposition testimony of Cindy Weingart, Sedgwick dealt directly with Nash Finch in administering Ms. Fair's claims. No insurance company was involved, no insurance company made payments to Ms. Fair's medical providers, and there was no reimbursement made. Rather, Nash Finch directly paid--albeit through a bank account controlled by Sedgwick--the

---

[14] "Patty" is Patricia Nylin, a claims manager for Nash Finch. See Docket Nos. 111-5 at 3 (Weingart Depo. 12:24 – 13:2), 111-6 at 1 (Nylin Depo. 4:20-21).

[15] As noted earlier, no party explains what Traveler's role was in regard to Ms. Fair's claims. See Footnote 3, *supra*.

benefits owed to Ms. Fair.  Sedgwick never advanced any of its own money on behalf of Nash Finch to pay any portion of Ms. Fair's workers' compensation claims.

The South Dakota statutes establishing the obligations of the parties when a deductible is chosen is clear.  Under SDCL § 62-5-20, if a deductible is chosen, the "insurer shall pay the entire cost of the employee's loss and then seek reimbursement from the insured employer for the amount of the deductible."  The insurance policy between Nash Finch and Royal & Sun contained language similar to the South Dakota statute establishing the way claims would be paid:  "[Royal & Sun] will pay benefits and damages that [Nash Finch] are required to pay under this policy.  We will only seek reimbursement for those amounts, including the appropriate amount of 'allocated loss adjustment expense,' that are within the applicable deductible shown above."  See Docket No. 98-1 at 81.

Nevertheless, and contrary to both South Dakota statute and the insurance policy between Nash Finch and Royal & Sun, Nash Finch paid the claims directly by funding a separate bank account owned by Sedgwick, the third-party administrator.

"In recent years, a number of alternatives to traditional commercial insurance have appeared in the market in response to what have been difficult economic conditions.  These are generally referred to as 'alternative risk

transfer' arrangements."  1-1 Appleman on Insurance § 1.09[1] (2012).  The

arrangements include self-insurance.  "Large corporations and governmental

units (such as cities, counties, or the state) may prefer to self-insure rather

than purchase insurance from an insurance company."  Id. § 1.09[2].  The

"decision to have a deductible or co-insurance obligation in order to reduce the

premium one pays can be viewed as a decision to self-insure."  Id.

Based on the arrangement that Nash Finch had with Sedgwick, it is clear

that Nash Finch retained all or a substantial risk under its workers'

compensation policy.  Nash Finch readily admits that the insurer was not

involved in handling Ms. Fair's claim once Nash Finch chose an unbundled

insurance policy.  In fact, it would have been difficult for Royal & Sun to

remain involved at all given the fact that Royal & Sun transferred the original

claim files to Sedgwick without retaining any copies.

South Dakota law requires employers to secure payment of workers'

compensation from (1) a licensed insurer; or (2) "an association organized for

the exchange of reciprocal or interinsurance contracts . . . for the purpose of

providing indemnity among themselves."  SDCL §§ 62-5-2, 62-5-3.  An

employer who is self insured must annually provide "satisfactory proof to the

Department of Labor of the employer's solvency and financial ability to pay the

compensation required."  SDCL § 62-5-5.  After receiving such proof, the

department issues a certificate of exemption that relieves the employer of the

obligation to purchase workers' compensation insurance through the above methods. An employer seeking to be self-insured must also furnish the department with

> a bond, written by a surety company authorized by the division of insurance to write surety bonds, or case, or certificate or deposit, or approved government securities, or an irrevocable letter of credit or an irrevocable trust, alone or in any combination, in a total amount equal to the greater of:
> (1)  Two hundred fifty thousand dollars; or
> (2)  Twice the amount of compensation and medical claims paid by the employer during the preceding calendar year; or
> (3)  The amount designated by the employer as a reserve for workers' compensation and medical claims.

SDCL § 62-5-10.

Nash Finch asserts several times throughout its briefs that they chose to purchase an insurance policy from Royal & Sun and did not choose to self-insure and, therefore, had no need to comply with the South Dakota laws relative to self-insurance. Based on this assertion, Nash Finch argues that it cannot be considered a self-insured employer.

Although Nash Finch has not complied with SDCL § 62-5-10, the arrangement with Royal & Sun and Sedgwick after Royal and Sun transferred the takeover claims to Sedgwick in 2004 indicates that, in fact, Nash Finch was self-insured for workers' compensation claims up to $500,000. See Laffery v. Reliance Ins. Co., 109 F. Supp. 2d 837, 845 (S.D. Ohio 2000) (even though employer did not file a certificate of self-insurance as required by the state of

Ohio, the court found that it was nonetheless self-insured under the facts of the insurance agreement). "A common practice of business is to self-insure up to a certain amount, and then to cover any excess with insurance." United States v. Baxter Intern., Inc., 345 F.3d 866, 894 (11th Cir, 2003 (quoting Black's Law Dictionary 1120 (5th ed. 1979)). Indeed, self-insurance includes circumstances where the "amount of an otherwise-covered loss that is not covered by an insurance policy...[i]s paid before the insurer pays benefits." Id. at 894 n. 20.

"The key to determining whether a party is self-insured is to determine who retains the risk of loss." See Dirksen, 2003 WL 21949733 at *7. Nash Finch assumed substantial financial risk for the cost of claims and cost of defending suits and negotiating settlements. After Nash Finch hired Sedgwick to administer workers' compensation claims on its behalf, Nash Finch funded the Sedgwick account that was used to pay Ms. Fair's medical providers. Nash Finch was closely involved in the management of Ms. Fair's claim. Patty Nylin, claims manager for Nash Finch, instructed Sedgwick to let the Travelers insurance company know it could close its file because there was no advantage to having the insurer pay a portion of the claim since it was all Nash Finch's money. Essentially, under the policy chosen by Nash Finch beginning in 2004, Nash Finch was self-insured for all claims other than those catastrophic claims that would exceed the $500,000 deductible. "[S]elf-insurance can be

33

understood both as the practice of setting aside a reserve to pay claims, and the practice of paying a deductible before third-party coverage becomes effective."[16]  Baxter Intern., 345 F.3d at 894 n.20.

During the period of time when Ms. Fair's claims at issue in this litigation were handled, and looking through the form of the workers' compensation policy purchased by Nash Finch to the substance of the policy and how it was carried out, it is clear Nash Finch was self-insured for the first $500,000 per occurrence.  Nash Finch directly funded the account used by Sedgwick to pay claims, Nash Finch instructed Sedgwick not to share any portion of the medical claims with the insurance company, and Nash Finch retained control of Ms. Fair's claim.  Under these circumstances, no risk transferred to the insurance company unless and until a single claim reached

---

[16] "In unbundling, the employer purchases a policy that does not include any claims management services."  Martin McGavin, Is an Unbundled Workers Compensation Program Right for Your Company? (August 2001), http://www.irmi.com/expert/articles/2001/mcgavin08.aspx.  "In most cases, unbundling requires the employer to assume most of the risk for covered claims.  This is typically accomplished through a large-deductible policy."  Id. "Unbundling – assuming it is achieved with a high deductible insurance program – is most often a substitute for self-insurance.  Employers considering self-insurance will find that an unbundled program offers nearly the same claims management flexibility without all the administrative burden of complying with state self-insurance application and reporting requirements." Id.  "Unbundling is an alternative to traditional insurance for employers who want the claims management flexibility of self-insurance without the entire administrative burden."  Id.

the limit of $500,000 paid out in benefits. No risk of loss ever transferred to Sedgwick under this post-2003 arrangement.

Nash Finch cannot act as a self-insured employer by directly providing 100% of the money used to pay claims and managing the administration of those claims, while at the same time asserting they have no duty of good faith in doing so. Nash Finch was, therefore, during the period of time Anna Fair's claims were handled in this case, self-insured for all workers' compensation claims up to $500,000, and was, for all practical purposes the primary insurer. As such, the court finds Nash Finch owed a duty of good faith to Ms. Fair in administering her workers' compensation benefits.

### 2. Whether Nash Finch is Vicariously Liable for Sedgwick's Conduct

Ms. Fair also asserts that Nash Finch, as Sedgwick's principal, is liable for Sedgwick's wrongful acts. "A principal may be liable for an agent's acts where the agent's 'purpose, *however misguided*, is wholly or in part to further the [principal's] business.' " Hass v. Wentzall 2012 S.D. 50, ¶ 22, 816 N.W.2d 96, 103. The South Dakota Supreme Court has established a two-part test when analyzing vicarious liability claims. "The fact finder must first determine whether the act was *wholly* motivated by the agent's personal interests or whether the [act] had a dual purpose, that is, to serve the master and to further personal interests." See Hass v. Wentzlaff, 2012 S.D. 50, ¶ 21, 816 N.W.2d 96 (citing Kirlin v. Halverson, 2008 S.D. 107, ¶ 24, 758 N.W.2d 436,

444) (emphasis in original).  "When a servant acts with an intention to serve *solely* his own interests, this act is not within the scope of employment and his master may not be liable for it."  Id. (emphasis in original).

"If the act was for a dual purpose, the fact finder must then consider the case presented and the factors relevant to the foreseeability of the servant's act in order to determine whether a nexus of foreseeability existed between the agent's employment and the activity which caused the injury."  Id. (citing Kirlin, 2008 S.D. at ¶ 25, 758 N.W.2d at 444).  "If such a nexus exists, the fact finder must, finally, consider whether the conduct is so unusual or startling that it would be unfair to include the loss caused by the injury among the costs of the employer's business."  Id. (citing Leafgreen v. Amer. Fam. Mut. Ins. Co., 393 N.W.2d 275, 280-81 (S.D. 1986)).

The court has already determined that Nash Finch was self-insured for the first $500,000 of any workers' compensation claim and that Nash Finch owed a duty of good faith to Ms. Fair.  Additionally, the undisputed facts show that Nash Finch hired Sedgwick to administer Nash Finch's workers' compensation claims on Nash Finch's behalf.  As such, Nash Finch as Sedgwick's principal may, under a vicarious liability theory, be held liable for the foreseeable acts of Sedgwick which were done in whole or part to further Nash Finch's business interests.

Here, the act that Ms. Fair is asserting that Nash Finch is liable for is the results of Sedgwick's performance metric program, which Ms. Fair asserts was improper and led to improper claims handling by Sedgwick's claim adjusters. Ms. Fair asserts that as a result of this program, Sedgwick's employees acted in bad faith in administering her workers' compensation benefits.

Bad faith in South Dakota has two elements. A plaintiff must prove: (1) that a claim was denied or benefits withheld without a reasonable basis; and (2) knowledge or reckless disregard of the lack of a reasonable basis for the denial. Stene v. State Farm Mut. Auto. Ins. Co., 583 N.W.2d 399, 402 (S.D. 1998); Walz v. Fireman's Fund Ins. Co., 556 N.W.2d 68, 70 (S.D. 1996). It is entirely permissible for insurance companies to challenge claims which are "fairly debatable." Stene, 583 N.W.2d at 403. Moreover, "[b]eing dilatory or even slow . . . doesn't in and of itself amount to bad faith." Ulrich v. St. Paul Fire & Marine Ins. Co., 718 F. Supp. 759, 763-64 (D.S.D. 1989).

The parties dispute the facts regarding the handling of Ms. Fair's claim and exactly why the Wound Care bills were not being paid. Nash Finch asserts that Ms. Jesperson, the Sedgwick claims adjuster for Ms. Fair's workers' compensation claim, merely made a mistake by not carefully reading correspondence from Ms. Fair's attorney regarding Ms. Fair's treatment at Wound Care. Furthermore, Nash Finch asserts that it was Ms. Fair's attorney who directed Wound Care to bill Medicare.

37

Ms. Fair asserts that Ms. Jesperson was made aware by e-mail that Ms. Fair was being treated again for a recurrence of her prior injury. The e-mail to Ms. Jesperson indicated that Ms. Fair was treating at both Rapid Care and Wound Care. Thus, although Ms. Fair's attorney did not directly tell Ms. Jesperson that he instructed Wound Care to bill Medicare until the insurance issue was resolved, Ms. Fair asserts that Ms. Jesperson was aware that Ms. Fair was in fact treating at two facilities.

In response to the question why Ms. Jesperson never took action to correct the billing issue, Ms. Jesperson gives conflicting explanations. She asserts that she did not read her e-mail close enough to realize that Ms. Fair was treating at two separate facilities and therefore assumed that Ms. Fair was only treating at Rapid Care. Ms. Jesperson also asserts that she believed Rapid Care and Wound Care to be the same facility.

Ms. Jesperson's credibility as to why the bills were not being paid or handled in the appropriate manner is a question for the jury. "In a ruling on a motion for summary judgment a court must not weigh evidence or make credibility determination." Kenny v. Swift Transp., Inc., 347 F.3d 1041, 1044 (8th Cir. 2003) (referencing Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when she or] he is ruling on a motion for summary judgment. . . .")).

The questions surrounding the billing issue regarding Ms. Fair's treatment at Wound Care are questions for the jury and go directly to whether Nash Finch and Sedgwick had a reasonable basis for denying or withholding benefits. When viewing the facts in the light most favorable to Ms. Fair, there are issues of material fact which preclude summary judgment.

Additionally, the parties dispute whether the performance metric program that Sedgwick initiated in 2009 was improper. The defendants assert that the performance metric initiated by Sedgwick related only to closed claims, which necessarily excluded Ms. Fair's open claim. Additionally, several Sedgwick employees--Ms. Adams, Ms. Weingart, and Mr. Oertli--all indicate that the purpose of the performance metric program was only to ensure that Sedgwick employees were following Sedgwick's best practices and reducing costs by using proper processes for administering claims and using networks available to Sedgwick.

Ms. Fair asserts that the program initiated by Sedgwick and Nash Finch put pressure on Ms. Jesperson and other Sedgwick employees to reduce costs. With regard to defendants' assertion that the statistics relate to closed files whereas Ms. Fair's claim is open, Ms. Fair disputes this characterization. Ms. Fair points out that the performance metric program was instituted to reduce the amount of money defendants paid out on claims. By definition, no monies are paid out on closed claims, so the program can only have its desired

effect on claims that are open–either by denying payments on those claims or by closing the files (or both).  Furthermore, Ms. Fair asserts that in 2010, defendants in fact did close Ms. Fair's file.  Regardless, the e-mails sent out by Ms. Adams, whether relating only to closed claims or all claims, clearly indicate Sedgwick's goal of reducing costs by 10%.

Additionally, the e-mails illustrate the effort that Sedgwick was putting into the program:  "[w]e will review at the end of each calendar quarter (April, July, October, and January) and recognize the claim team who has the highest percentage of cost reduction" (Docket No. 58-15); "I am going to begin monitoring medical only claims open longer than 90 days and indemnity claims open longer than 6 months.  If I have questions will start sending an email to the examiner and supervisor.  We need to move some of these claims to closure." (Docket No. 58-18).  It is apparent there was some pressure being exerted on Sedgwick employees, including Ms. Jesperson, to reduce costs. Viewing these facts in the light most favorable to Ms. Fair, there are issues of material fact as to whether the program improperly motivated claims handling.

Here, the facts indicate that the purpose of the performance metric program was to cut costs by 10%.  This would clearly be a benefit to Nash Finch, the party ultimately responsible for those costs.  In addition, the e-mails authored by Ms. Adams recognized several departments and individuals, including Ms. Jesperson, who achieved positive results in cutting Nash Finch's

costs. As for those who were not reaching the goal, Ms. Adams' e-mails specifically indicated that she would begin contacting those employees and their supervisors directly. It would certainly have been in Sedgwick employees' best interest to do whatever it took to achieve the desired results.

As discussed above, there are questions of material fact that go directly to whether the performance metric program motivated improper claims handling by Sedgwick employees, including Ms. Jesperson. These issues bear directly on whether Nash Finch and Sedgwick had a reasonable basis to deny or withhold the benefits owed to Ms. Fair.

Finally, Sedgwick kept Nash Finch apprised of its claims handling practices, including the implementation and progress of the performance metric program. Therefore, Sedgwick's actions in handling Ms. Fair's claims were foreseeable to Nash Finch. In addition, Sedgwick's actions in handling Ms. Fair's claims primarily benefitted Nash Finch, but ultimately benefitted both parties, as discussed more fully below. Viewing the facts in light most favorable to Ms. Fair, the court finds that there are issues of material fact underlying the vicarious liability claim against Nash Finch which precludes summary judgment.

### 3. Whether Nash Finch is Liable for Aiding and Abetting

Ms. Fair also asserts that Nash Finch is liable for having aided and abetted Sedgwick and Royal & Sun. Ms. Fair asserts that Nash Finch acted in

concert with Royal & Sun by entering into a "fronting" arrangement with Royal & Sun in order to avoid having to register as a self-insurer. Ms. Fair also asserts that Nash Finch acted in concert with Sedgwick by supporting and encouraging the performance metric program put in place by Sedgwick to save a target of 10% on its claims.

In Chem-Age Indus. v. Glover, 2002 SD 122, § 41, 652 N.W.2d 756, 774, the South Dakota Supreme Court noted that "several courts recognize a cause of action for aiding and abetting the breach of a fiduciary duty." The court held that to establish a cause of action for aiding or assisting in the breach of a fiduciary duty, a plaintiff must prove: "(1) the fiduciary breached an obligation to plaintiff; (2) defendant substantially assisted the fiduciary in the achievement of the breach; (3) defendant knew that the fiduciary's conduct constituted a breach of duty; and (4) damages were sustained as a result of the breach." Id. at ¶ 46, 652 N.W.2d at 775.

As discussed above, there are questions of material fact relating to the handling of Ms. Fair's workers' compensation claim. Nash Finch was receiving the e-mails from Sedgwick regarding the performance metric program and was aware of Sedgwick's goal of reducing costs by 10%. A question of material fact exists as to whether that program improperly motivated claims handling. This question goes directly to whether Sedgwick breached an obligation to Ms. Fair and whether Nash Finch aided and abetted that breach. The evidence adduced

thus far shows that Nash Finch was aware of Sedgwick's actions and had input into those actions.

Based on the foregoing, the court finds with regards to workers' compensation claims, that Nash Finch was self-insured for the first $500,000 per occurrence. As a result, Nash Finch owed a duty of good faith and fair dealing to Ms. Fair when administering her workers' compensation claim. In addition, the court finds questions of material fact exist as to whether Nash Finch breached its duty of good faith, whether Nash Finch was vicariously liable for Sedgwick's breach, and whether Nash Finch aided and abetted Sedgwick's breach of a fiduciary duty. Therefore, as it pertains to Nash Finch, the court recommends denying the motion for summary judgment .

## C. Claims Against Sedgwick CMS

Sedgwick asserts that it is entitled to summary judgment because it is a third-party administrator, not an insurer, and is not subject to a duty of good faith and fair dealing. Ms. Fair asserts that Sedgwick is liable under three theories: (1) breaching the duty of good faith; (2) acting as an agent of Nash Finch; and (3) aiding and abetting Nash Finch's conduct. Ms. Fair also asserts that, with regards to these theories of liability, there are questions of material fact which, when viewed in the light most favorable to Ms. Fair, preclude summary judgment.

### 1. Whether Sedgwick Owes Ms. Fair a Duty of Good Faith

Ms. Fair asserts that Sedgwick is liable for breaching its duty of good faith. The South Dakota Supreme Court has not decided whether a claims administrator has a duty of good faith. Because this case is before the court on diversity jurisdiction, the substantive law of the forum state–here, South Dakota–must be applied. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Where there is no direct state court decision on point, this court must attempt to predict how the state court would decide the issue, using decisions from other jurisdictions as guides. Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 715 (8th Cir. 2004).

Ms. Fair asserts that Sedgwick admitted that they owed a duty of good faith. During her deposition, Ms. Weingart answered "yes" when asked if she agreed that "a company administering a claim such as Sedgwick must deal fairly and in good faith with injured people." See Docket No. 111-5 at 5 (Weingart Depo. 22:11-14). Mr. Oertli also agreed that Sedgwick had the same duties and obligations in administering insurance claims as an insurance company would. See Docket No. 111-2 at 4 (Oertli Depo 16:10-17). Ms. Fair asserts that a party may simply admit that it owes a duty of good faith. The court disagrees. "The determination of whether a duty exists is a question of law for the courts." Casillas v. Schubauer, 2006 S.D. 42, ¶ 14, 714 N.W.2d 84,

88 (citing <u>Bordeaux v. Shannon Cnty. Sch.</u>, 2005 S.D. 117, ¶ 11, 707 N.W.2d 123, 126).

The South Dakota Supreme Court, in <u>Champion</u>, adopted the "two-prong test in cases of alleged bad faith failure to pay a workers' compensation carrier" as established by the Colorado Supreme Court in <u>Travelers Ins. Co. v. Savio</u>, 399 N.W.2d 320, 324 (Colo. 1985).  <u>See</u> <u>Champion</u>, 399 N.W.2d at 324.  The Colorado Supreme Court subsequently held that an "independent claims adjusting company, . . . acting on behalf of a self-insured employer owes a duty of good faith and fair dealing to an injured employee in investigating and processing workers' compensation claims even in the absence of contractual privity with the employee."  <u>Scott Wetzel Servs., Inc. v. Johnson</u>, 821 P.2d 804, 813 (Colo. 1991).

In <u>Johnson</u>, two Safeway employees[17] filed an action against Scott Wetzel Services ("Wetzel"), the claims administration service acting under contract with the employer, Safeway, to administer Safeway workers' compensation claims.  <u>Id.</u> at 808.  The employees contended that Wetzel did not act in good faith or deal fairly when processing their claims for workers' compensation benefits.  <u>Id.</u>  The employees argued "that Wetzel, knowing that the claimants

---

[17] The Colorado Supreme Court consolidated two cases, <u>Johnson v. Scott Wetzel Servs., Inc.</u>, 797 P.2d 786 (Colo. App. 1990) (hereinafter "<u>Johnson I</u>") and <u>Tozer v. Scott Wetzel Servs., Inc.</u>, No. 88CA1723 (Colo. App. 1990), for purposes of briefing and argument.  Both cases involved similar issues.

were experiencing extreme financial hardships, employed dilatory tactics to exploit this vulnerability." Id. at 808-09. The employees argued that through these delays, "Wetzel hoped to induce the claimants to settle for less than the fair value of their claims." Id. at 809. As a results of Wetzel's tactics, the employees argued they "had insufficient funds to pay for basic necessities, causing mental distress and financial indebtedness." Id. The employees argued that, had Wetzel acted with good faith and fair dealing, the employees would have received the benefits they were owed in a timely fashion. Id.

At the trial level, Wetzel was held not liabile as a matter of law.[18] On appeal, the appellate court reversed, concluding that Wetzel, as the adjusting firm, had a duty to act in good faith when investigating and processing the workers' compensation claims. Id.

In Johnson, the dispositive issue before the Colorado Supreme Court was "whether an independent claims adjusting firm owes a duty of good faith and fair dealing to an injured claimant in investigating and processing a workers'

---

[18] In Johnson I, at the conclusion of the evidence, Wetzel moved for a directed verdict. Johnson, 821 P.2d at 807. The trial court deferred ruling on the motion and submitted the case to the jury. Id. After the jury was unable to reach a verdict, the trial court granted Wetzel's motion for a directed verdict. Id. 807-08. The trial judge held that "in order to bring this kind of action, there must be an insurance contract between the plaintiff and the defendant, or at least the plaintiff must be a beneficiary of an insurance contract issued by the defendant." Id. at 808. In Tozer, the trial court granted summary judgment in favor of Wetzel, holding that "Wetzel lacked a duty to Tozer to act in good faith in processing Tozer's workers' compensation claim." Id. at 808.

compensation claim in the absence of contractual privity with the claimant."

Id. at 809. At the outset, the court noted that "Safeway, as a self-insured employer, cannot relieve itself of its obligation of good faith and fair dealing by contracting out its responsibilities." Id. at 811. However, the court noted that this did not resolve the question of whether the independent claims adjuster also had such a duty independent of and in addition to the duty imposed on the self-insured employer. Id.

The Colorado Supreme Court noted that "the duty of good faith and fair dealing owed by insurers and self-insurers to workers' compensation claimants is rooted in the Act." Id. The court went on to say:

> The regulations promulgated under the Act specifically contemplates the use of claims administration services by self-insured employers as an important part of the scheme for delivery of workers' compensation benefits by self-insured employers. When the employer acts as a self-insurer, the claims administration service plays an integral role in the provision of benefits.

Id. Therefore, the court noted that "the self-insurer regulatory scheme . . . specifically envisions the use of independent claims administration services to provide benefits." Id. at 812. The court recognized that the role of a claims adjusting service, therefore, derives not solely from its contract with the self-insured employer, but based on statute and regulation as part of the benefit-delivery process. Id.

In Johnson, the court noted that Wetzel was providing claims administration as contemplated by regulation: "Wetzel processed the

paperwork, investigated the claims, obtained medical reports, made initial determinations of a claimant's eligibility for benefits, and paid medical bills with checks written on its own account."[19]  Id.  "Through performing these services, Wetzel effectively delivered the workers' compensation benefits and took many of the steps necessary to perform the employer's duty of good faith and fair dealing owed to the claimants."  Id.  The court also noted, that "Wetzel was aware that it was instrumental in carrying out Safeway's duties to workers' compensation claimants.  Under these circumstances, Wetzel had a duty of good faith and fair dealing to Safeway's workers' compensation claimants."  Id. (citing Morvay v. Hanover Ins. Cos., 506 A.2d 333, 335 (N.H. 1986) (one who investigates insurance claims under contract with insurer owes a duty of reasonable care to insured as well as to insurer because insured is a foreseeably affected party); Cont'l Ins. Co. v. Bayless & Roberts, Inc., 608 P.2d 281, 287-88 (Alaska 1980) (insurance adjuster owes duty of ordinary care to insured even though adjuster's contract is with insurance company only)).

The Colorado Supreme Court remarked

We act with an eye toward serving the purposes behind the workers' compensation system.  The Act has the humanitarian purpose of assisting injured workers and their families, Claimants in Matter of Death of Garner v. Vanadium Corp., 572 P.2d 1205, 1207 (Colo. 1977), by giving them a reliable source of compensation.  Engelbrecht v. Hartford Accident & Indem. Co., 680 P.2d 231, 233 (Colo. 1984).

---

[19] Although Wetzel paid medical bills with checks written on its own account, that account was funded by Safeway.  Johnson, 821 P.2d at 806.

One of the purposes of the Act is to provide a method whereby claims arising out of employment-related accidents may be speedily resolved. Industrial Comm'n v. Globe Indem. Co., 358 P.2d 885, 886 (Colo. 1961). "The Workmen's Compensation Act was intended to supply every employee within its protection with a more or less summary and speedy procedure . . . to recover compensation for an injury from an industrial accident occurring in the course of his employment and arising out of it." Industrial Comm'n v. Shaefer Realty Co., 56 P.2d 51, 51 (Colo. 1936).

Id. at 812.

The court noted that "[i]n the absence of an obligation to deal in good faith and fairly," both self-insured employers and independent claims administration services "may create obstacles to payment." Id. "This kind of delaying tactic runs counter to the goals of workers' compensation." Id. Based on this reasoning, the Colorado Supreme Court held that "an independent claims adjusting company, such as Wetzel, acting on behalf of a self-insured employer owes a duty of good faith and fair dealing to an injured employee in investigating and processing a workers' compensation claim even in the absence of contractual privity with the employee." Id. at 813.

In a subsequent Colorado case, Cary v. United of Omaha Life Ins. Co., 68 P.3d 462 (Colo. 2003), the Colorado Supreme Court decided a similar issue, albeit outside the peculiar circumstances of the workers' compensation realm. The Supreme Court in Cary described the issue presented as "[w]hether third-party administrators of health insurance plans owe the insured any duty to process claims and determine coverage in a reasonable or good faith manner,

49

and hence, whether they can be liable for either bad faith or negligence in the handling of those claims." Id. at 463 n.1. In Cary, a self-insured entity retained the defendants to administer its health insurance plan. The defendants were empowered to establish claim handling procedures, verify claimant eligibility, process claims, distribute payments, and so on. Id. at 464.

The plaintiff, an insured under the plan, sued the defendant claims administrator, alleging bad faith breach of contract arising out of a denial of benefits. Id. at 464-65. The trial court granted summary judgment to the claims administrator, finding that no contract existed between the insured and the claims administrator, and therefore, no basis for a bad faith breach of contract claim could be had. Id.

The Colorado Supreme Court granted certiorari and reversed. The court emphasized that, because of the "special relationship" between an insurer and insured, the insurer owes a tort-like duty of good faith and fair dealing to its customers. Id. at 466. The court explained that "[i]n the typical insurance case, only the insurer owes the duty of good faith to its insured; agents of the insurance company--even agents involved in the claims processing--do not owe a duty, since they do not have the requisite special relationship with the insured." Id. However, the court went on to explain that there could be circumstances in which a claims administrator incurs an "independent duty to investigate and process the insure's claims in good faith." Id. The court

explained that when the actions of the claim administrator "are similar enough to those typically performed by an insurance company in claim administration and disposition, we have found the existence of a special relationship sufficient for imposition of a duty of good faith and tort liability for its breach--even when there is not contractual privity between the [insurer and insured]." Id.

The court also discussed its prior decision in Johnson. Id. at 467. The court noted that while the decision in Johnson was "based in part on the Workers' Compensation Act," Johnson "makes it clear that [the] departure from the privity requirement is also premised on the fact that the adjuster 'effectively delivered the workers' compensation benefits and took many of the steps necessary to perform the employer's duty of good faith and fair dealing owed to the claimants.' " Id. (citing Johnson, 821 P.2d at 812). The court emphasized that it was the nature of the claims administrator's activities, not just the statutory scheme, that warranted imposing a duty to the insured. See id.

In Cary, the court noted that the claims administrator "fulfilled virtually all of the functions normally performed by an insurance company in processing claims and determining whether to deliver insurance benefits." Id. at 468. The court held that "[w]hen a third-party administrator performs many of the tasks of an insurance company and bears some of the financial risk of loss for the claim, the administrator has a duty of good faith and fair dealing to the insured in the investigation and servicing of the insurance claim." Id. at 469.

Several other courts have made similar findings when considering whether a third-party administrator can be held liable for bad faith in the absence of contractual privity with the claimant. In <u>Dellaira v. Farmers Ins. Exch.</u>, 102 P.2d 111, 112 (N.M. 2004), Farmers Insurance Company of Arizona ("FICA") issued an automobile policy to plaintiff. Farmers Insurance Exchange ("FIE"), a third-party administrator, directed, handled, administered, and adjusted all claims submitted by FICA's policy holders. <u>Id.</u> The plaintiff sued FICA, FIE, and others for breach of contract, insurance bad faith, and breach of fiduciary duties with respect to the handling of a claim for vehicle damage. <u>Id.</u> The district court dismissed the claims. <u>Id.</u>

On appeal, the issue was "whether the bad faith dealing rule applies between an insured and an entity that handles the insurance function of claim determination, a function inherent in the insurance transaction." <u>Id.</u> at 114. In discussing the issue, the court referred to the Colorado Supreme Court's decision in <u>Cary</u>, finding the rationale of that decision to be persuasive. The court stated "[w]e do not see any sound reason why New Mexico should not permit pursuit of such a claim where, as is suggested by the pleadings, an entity related to or pursuant to agreement with the insurer issuing the policy has control over and makes the ultimate determination regarding the merits of an insured's claim." <u>Id.</u> at 115. The court also noted:

> [t]he reason why courts have recognized the special and unique
> relationship between the insurer and insured include the inherent

lack of balance in and adhesive nature of the relationship, as well as the quasi-public nature of insurance and the potential for the insurer to unscrupulously exert its unequal bargaining power at a time when the insured is particularly vulnerable.

Id. The court held that "an entity that controls the claim determination process may have an incentive similar to that of an unscrupulous insurer to delay payment or coerce an insured into a diminished settlement. The entity acts as an insurer and is therefore bound within the special relationship created through the insurance contract." Id.

In Eves v. AIG, Inc., 2010 WL 749925, *1 (S.D. Ohio 2010), a case involving insurance for professional liability, Eves alleged that AIG breached the policy and the duty of good faith owed to Eves by failing to negotiate and settle a third-party claim against him. AIG moved to dismiss Eves' claim based on the theory that AIG was not a party to the contract between Eves and the third party and, therefore, as a matter of law could not be held liable for breach of contract or breach of a duty of good faith. Id. The issue before the court was "whether the lack of privity of contract preclude[d]" Eves' claim.

No Ohio court had ruled directly on the issue, leaving the district court to predict how the Ohio state court would decide the issue. Id. at *3. The court began by noting the general rule that "a duty of good faith arises from the contraction relationship between the insured and insurer." Id. at *2. However, the court also recognized that several jurisdictions "have carved out an exception to this general rule by allowing a bad faith claim to survive against

53

entities that do not have privity of contract, but function as an insurer and manage insurance claims." Id.

The Eves court observed that in Dombroski v. Wellpoint Inc., 879 N.E.2d 225, 235-38 (Ohio App. Ct. 2007), "an Ohio appellate court noted, in *dicta*, that in insured may pursue a bad faith claim against an entity that manages the insurance policy, even where the insured can not establish privity of contract with that entity." Id. at *3. The Dombroski court looked to other jurisdictions to develop a "management theory" that applies "when one insurance company hires or forms another company to manage it." Dombroski, 879 N.E.2d at 236. The court in Dombroski relied heavily on Dellaira in developing the management theory. "Management theory extends the duty of good faith to the managing entity because it assumes the duties of the insurance company." Id. at 239-37. Dombroski recognized that the management entity is acting as an insurer, and that it "should be bound within the special relationship created through the insurance contract." Id. at 237. Thus, citing Dellaria, the court in Dombroski held that " 'an insured's expectations of good faith handling and ultimate determination of his or her claim for the benefits by the insurer extends no less to an entity that both handles and determines the claim than to the insurer issuing the policy.' " Dombroski, 879 N.E.2d at 237 (quoting Dellaria, 102 P.3d at 114).

In Eves, the district court also noted that "numerous other courts have also extended the duty of good faith to parties that are not privy to an insurance contact." Eves, 2011 WL 749925 at * 3 (citing Wolf v. Prudential Ins. Co. of America, 50 F.3d 793, 797 (10th Cir. 1995) ("the analysis should focus more on the factual question of whether the administrator acts like an insurer such that there is a special relationship between the administrator and insured that could give rise to a duty of good faith); Cary, 68 P.3d at 469 ("when a third-party administrator performs many of the tasks of an insurance company and bears some of the financial risk of loss for the claim, the administrator had a duty of good faith and fair dealing to the insured in the investigation and servicing of the claim")).

In Eves, AIG argued that the holding in "Dombroski only envisioned applying the management theory where the insured is without recourse from its insurer." Id. at *4. The district court disagreed with AIG's position, noting that "Dombroski, as well as the decisions it relies upon from other courts, makes clear that the chief concern is preventing an insurer from insulating itself through the device of the management company, and disallowing a plaintiff redress from the entity that is potentially causing the harm." Id. The court concluded that "Ohio would likely recognize the 'management theory,' and allow a bad faith claim when an insurance company forms or hires another

company to manage its claims, even when there is not privity of contract between the management company and the insured." Id. at *5.

Although the South Dakota Supreme Court has not considered a case involving the issue here--whether a third-party administrator owes a duty of good faith to an insured--it has considered a case involving whether a rehabilitation consultant can be held liable for bad faith absent contractual privity with the insured. The South Dakota Supreme Court, in Gilchrist v. Trail King Indus., Inc., 2000 S.D. 67, ¶ 16, 612 N.W.2d 10, 15, considered whether an employer's rehabilitation consultant could be held liable to a workers' compensation claimant for bad faith.

Gilchrist was an employee of Trail King Industries, Inc. ("Trail King"). Id. at ¶ 2, 612 N.W.2d at 12. While working in the scope of his employment, Gilchrist slipped and fell off a platform. Id. As Gilchrist fell, his "pinkie" finger caught on a bracket, momentarily suspending his fall and injuring him. Id. As a result of the fall, Gilchrist complained of injuries to his finger, neck, shoulder, rotator cuff, hands, back, and internal organs. Id.

Trail King, a self-insured employer, began paying workers' compensation benefits to Gilchrist. Id. at ¶ 3, 612 N.W.2d at 12. Trail King hired Rehabilitation Strategies, Inc. ("RSI") to oversee Gilchrist's rehabilitation program. Kathy Burns, an RSI employee, was assigned to the case. Id. at ¶ 4,

612 N.W.2d at 12.  Burns began attending Gilchrist's doctors appointments with him and discussed Gilchrist's return to work with Trail King.  Id.

Three months after being injured, Gilchrist's doctor issued a release to work on light duty, four hours per day.  Id. at ¶ 5, 612 N.W.2d at 12.  However, Gilchrist's doctor was not aware that Gilchrist was vomiting blood and was bleeding from his rectum as Gilchrist did not report these problems to the doctor.  Id.  Gilchrist's doctor had requested that Burns provide other medical records which would have revealed these conditions, but Burns did not provide them.  Id. at ¶ 5, 612 N.W.2d at 13.  Burns had access to these records and knew of Gilchrist's ongoing medical problems, but did not mention these other conditions to Gilchrist's doctor.  Id.

Gilchrist reported to Trail King that he was still too ill to work and did not report back to work.  Id. at ¶ 6, 612 N.W.2d at 13.  Trail King sent Gilchrist a certified letter indicating that because his doctor had released him to go back to work, if he did not report to work within forty-eight hours after receipt of the letter he would be terminated.  Id.  Subsequently, Gilchrist saw two doctors which both authorized no work.  Id.  Later, doctors determined that Gilchrist would need surgery to repair his rotator cuff and injuries to his hands, which the doctor found to be work-related.  However, Gilchrist's doctor determined that the remaining injuries were not caused by the accident.  Id. at ¶¶ 7-8, 612 N.W.2d at 13.

Gilchrist's doctor again authorized Gilchrist to return to light duty work. Id. at ¶ 9, 612 N.W.2d at 13. After RSI received a letter from Gilchrist's doctor regarding the unrelated injuries, RSI recommended to Trail King that it not accept responsibility for the cost of the surgery on Gilchrist's hands. Id. at ¶ 10, 612 N.W.2d at 14. After receiving this news, Gilchrist cancelled the scheduled surgery because he did not have sufficient money to pay for the uncovered portion. Id. Gilchrist then filed a workers' compensation action against Trail King and RSI alleging bad faith, intentional infliction of emotion distress, and wrongful termination. Id. at ¶ 11, 612 N.W.2d at 14. The South Dakota Department of Labor ruled in Gilchrist's favor, finding that Gilchrist was entitled to rotator cuff and carpel tunnel surgery on his right hand; the department found that Gilchrist's other claims, including psychological disability, were not work-related. Id. at ¶ 12, 612 N.W.2d at 14.

Based on the department's decision, Trail King and RSI moved for summary judgment. Id. Gilchrist urged the trial court to postpone its summary judgment decision until after the circuit court ruled on his appeal from the department's decision. Id. The trial court declined to do so and granted summary judgment to RSI on all Gilchrist's claims, and denied Trail King's motion for summary judgment. Id.

Meanwhile, the circuit court presiding over Gilchrist's appeal of the department's decision on his workers' compensation claim reversed the

department's decision on Gilchrist's psychological disability claim and found it to be work-related.  Id.  Thereafter, the department ruled that the "depression that both sides agree now makes [Gilchrist] totally disabled," entitled him to continued total disability benefits.  Id.  Gilchrist appealed the trial court's ruling on his bad faith and intention infliction of emotional distress claims, contending the court was premature in granting summary judgment to RSI.  Id. at ¶ 13, 612 N.W.2d at 14.

Regarding Gilchrist's bad faith claim, the South Dakota Supreme Court noted that "to establish bad faith against a workers' compensation rehabilitation consultant there must first be a showing that the rehabilitationist owed a duty to the injured worker."  Id. at ¶ 17, 612 N.W.2d at 15.  The court noted that the existence of such a duty depended on the nature of the relationship:  "[t]hus, we must decide if a relationship existed between the parties that imposes on RSI a legal obligation to Gilchrist that may give rise to a tort for its violation."  Id.  Burns, during her deposition acknowledged that her role was a "coordinator, a communicator between the insurance company, the injured worker, the employer and the medical providers."  Id.

The court found "[f]or a workers' compensation claimant to have a separate cause of action against the rehabilitation consultant hired by the employer to assist the claimant in returning to work, the claimant must show that the consultant caused some additional injury to the claimant."  Id. at ¶ 19,

612 N.W.2d at 16.  Gilchrist claimed that "RSI acted in consort with Trail King to inflict emotional distress, to prematurely return him to work, to terminate his employment, and to end his medical care and coverage."  Id.  However, the court noted "the Department has now concluded, however, that Gilchrist is totally disabled and entitled to continued totally disability payments as a result of his work related depression, resulting from his original injury compounded by the delays in his rotator cuff and wrist surgeries."  Id. at ¶ 23, 612 N.W.2d at 16.  Thus, the court held that "the injuries for which Gilchrist claims RSI is responsible were adjudged to be work-related and compensable."  Id. Therefore, the court concluded that RSI did not cause any additional injuries to Gilchrist sufficient to sustain an action for bad faith.  Id.

With these cases in mind, it is clear that courts look to the relationship that the third-party administrator has with the insured when determining whether a duty of good faith exists absent contractual privity.  As discussed above, several jurisdiction look to the type of services and tasks that a third-party administrator performs to determine whether a duty of good faith and fair dealing is owed to the insured.  Additionally, the South Dakota Supreme Court looks to the type of relationship and the tasks being performed when determining whether a duty of good faith is owed to an insured.  See Gilchrist, 2000 SD at ¶ 17, 612 N.W.2d at 15.  The court finds these cases, particularly those decided by Colorado Supreme Court (since South Dakota originally

adopted the tort of bad faith from Colorado case law), to be persuasive and predicts that the South Dakota state court would likely recognize the same theory of liability. This court find that South Dakota would likely allow a bad faith claim against a third-party administrator when an insurance company or self-insured employer hires a third-party administrator to manage its claims, and the third-party administrator performs the same duties and obligations usually performed by the insurer, even when there is no privity of contract between the third-party administrator and the insured.

The <u>Gilchrist</u> decision is distinguishable. In that case, the rehabilitationist was hired by the insurance company with multiple conflicting goals, some of which favored the insurer, and some of which favored the employee. The rehabilitationist was to coordinate and communicate between the insurer, the employee, the employer, and the medical care providers. <u>Gilchrist</u>, 2000 S.D. 67, at ¶ 17, 612 N.W.2d at 15. The rehabilitationist's goal was to return the employee to work as quickly as possible, but also as safely as possible. <u>Id.</u> at ¶ 18, 612 N.W.2d at 16 (quoting <u>Campbell v. Eckman-Freeman & Assoc.</u>, 670 N.E.2d 925, 935 (Ind. Ct. App. 1996)). Thus, the rehabilitationist was not simply substituting for the insurer, directly making decisions about whether to pay claims submitted pursuant to the insurance policy. By contrast, that is exactly what Sedgwick was hired to do. Sedgwick

was a surrogate for the insurance company, or the self-insured employer as is the case here.

Additionally, allowing a third-party administrator to be sued for bad faith supports by the purposes of the South Dakota Workers' Compensation Act. The Colorado Supreme Court in <u>Wetzel</u> noted that the "duty of good faith and fair dealing owed by insurers and self-insurers to workers' compensation claimants is rooted in the Act." <u>Wetzel</u>, 821 P.2d at 811. The court remarked that the Colorado Workers' Compensation Act has the humanitarian purpose of assisting injured workers and their families by providing those workers and their families with a reliable source of compensation in a summary and speedy manner. <u>Id.</u> at 812. The court went on to state that in the absence of the obligation of good faith and fair dealing, the purpose of the Act may be frustrated by self-insured employers and claims adjusting services who may create obstacles to payment. <u>Id.</u>

The South Dakota Workers' Compensation Act has purposes similar to those of the Colorado Act. "The [South Dakota] Workers' Compensation Act is intended to provide injured employees a remedy that is expeditious and relatively inexpensive." <u>Lagge v. Corsica</u>, 2004 S.D. 32, ¶ 24, 677 N.W.2d 569, 575 (citing <u>Harn v. Cont'l Lumber Co.</u>, 506 N.W.2d 91, 95 (S.D. 1993)). <u>See also</u> <u>Shykes v. Rapid City Hilton Inn</u>, 2000 SD 123, ¶ 23, 616 N.W.2d 493, 498-99 ("The purpose is to provide employees, who are injured within the scope

of their employment, with reimbursement for medical care and wage benefits without having to prove the employer was at fault or negligent."); McDowell v. Citibank, 2007 S.D. 52, ¶ 14, 734 N.W.2d 1, 6 ("our workers' compensation act is designed to compensate an employee or his family for the loss of the employee's income-earning ability").

In the absence of an obligation to deal fairly and in good faith, self-insured employers or third-party administrators, may create road blocks to payment by simply "outsourcing" the duties of handling the claims to a third party. This type of delay would run contrary to the purposes of the South Dakota Workers' Compensation Act. Therefore, a finding that South Dakota courts would allow a bad faith claim against a third-party administrator when the third-party administrator performs the duties and obligations usually performed by the insurer, even in the absence of privity of contract, supports the purposes of the South Dakota Workers' Compensation Act.

With regards to Eves v. AIG, Sedgwick asserts that the Ohio district court adopted the "management theory" which has never been adopted by the South Dakota Supreme Court. This is an accurate observation; however, the South Dakota Supreme Court has also not rejected the theory. It is this court's duty, just as it was the duty of the Eves court, to try to predict how the South Dakota Supreme Court would decide this issue, using other jurisdictions and existing South Dakota case law as guides. See Midwest Oilseeds, Inc., 387

F.3d at 715. Moreover, although the Ohio courts may have termed their theory of liability the "management theory," it is nearly identical to theories of liability established by the Colorado Supreme Court and New Mexico Court of Appeals.

In its reply brief, Sedgwick cites Natividad v. Alexsis, Inc., 875 S.W.2d 695 (Tex. 1994), for the proposition that a claims adjuster cannot be held liable to the claimant for a breach of the duty of good faith and fair dealing, as the duty of the insurer is non-delegable. The defendants in Natividad made this same assertion, arguing that the duty of good faith belonged uniquely to the insurance carrier and was non-delegable to adjustors. See Natividad, 875 S.W.2d at 696. In Natividad, the workers' compensation insurance carrier, National Union Fire Insurance Co., had contracted with AIG Risk Management to provide all services under the policy. Natividad, 875 S.W.2d at 696. Subsequently, AIG contracted with Alexsis, Inc., to provide all claims-adjusting services under the contract. Id. The issue before the Texas Supreme Court was whether Alexsis could be held liable for the tort of bad faith handling of an insurance claim. Id. Thus, the Texas case involved two levels of subcontracting away the claims-handling duties, whereas this case involves a single level of subcontracting.

The Natividad court examined the first decision in which it had adopted the tort of bad faith denial of insurance benefits. Id. at 697. The court stated that the tort had always been based on the "special relationship" between the

parties that arose only because the insured and insurer were parties to a contract that was the result of unequal bargaining power, and that, "by its nature allows unscrupulous insurers to take advantage of their insureds." Natividad, 875 S.W.2d at 697-98 (citing Arnold v. Nat'l. County Mut. Fire Ins. Co., 725 S.W.2d 165, 167 (Tex. 1987)).  The court concluded that, "[w]ithout such a contract there would be no 'special relationship' and hence, no duty of good faith and fair dealing."  Id. at 698.

The Natividad court specifically rejected the Colorado court's reliance on the goals of the workers' compensation system as discussed in Wetzel as a rationale for extending the tort of bad faith to agents of an insurer.  Id.  The Natividad court said that, in Texas, the tort of bad faith does not rest on the policy goals of the workers' compensation system, but rather on the existence of the contract of unequal bargaining power.  Id.  Since Ms. Natividad had no contractual privity with Alexsis, Inc., the adjusting company that handled her claim, the Texas court refused to extend the bad faith cause of action to Alexsis.  Id.  Instead, the non-delegable duty of good faith remained squarely on the shoulders of the insurer, which was liable to Ms. Natividad for the acts of its agent, Alexsis.  Id.

The Natividad decision has never been adopted by the South Dakota Supreme Court.  The South Dakota Supreme Court has not typically looked to Texas law for guidance on questions of first impression.  And, the Texas courts

themselves have limited the reach of the <u>Natividad</u> decision, subsequently

allowing plaintiffs to sue third-party administrators under the Texas insurance

code. <u>See, e.g.</u> <u>Rankin Road, Inc. v. Underwriters at Lloyds of London</u>, 744 F.

Supp. 2d 630, 633 (S.D. Tex. 2010) (citing <u>Fasch v. Hartford Acc. & Indem. Co.</u>,

491 F.3d 278, 283 (5th Cir. 2007)). For both of these reasons, this court

declines to follow the lead of the Texas Supreme Court in <u>Natividad</u>. Finally,

South Dakota originally adopted its bad faith law from Colorado, and it seems

more likely to this court that the Colorado decisions regarding extension of bad

faith liability to third party administrators would be more persuasive to the

South Dakota Supreme Court, rather than a Texas decision that does not

appear to have been heralded even in its birthplace.

In this case, the "third-party administrator claims service agreement"

sets forth the obligations that Sedgwick had with regards to the takeover

claims from Royal & Sun.[20] See Docket No. 130-4. The agreement states:

1.    Claims Services To Be Performed by the Service Company. The
Service Company agrees to provide the following services with
response to any claims or losses occurring during the one-year
period commencing on _____, 19___ and ending _____, 19__ (the
"Claims") under the Policies:

a.    Receive and review all claims and loss reports, verify
coverage, create and maintain files, provide written

---

[20] Sedgwick was unable to locate and produce the final master carrier
agreement between Royal & Sun and Sedgwick regarding the takeover claims.
However, Sedgwick did produce two draft copies of the agreement. <u>See</u> Docket
No. 130 at 4.

chronology of all actions taken on each claim file, and retain closed claim files;

b. Conference any coverage issue with Royal within 72 hours of awareness that a coverage issue exists;

c. Investigate each Claim in accordance with industry standards and establish a reasonable and adequate reserve;

d. Adjust Claims for property and/or physical damage by preparing itemized estimates and/or appraisals of damage in accordance with industry standards, state law or regulation;

e. Maintain in each file a reasonably sufficient documentation in chronological order to allow the adjuster and Royal to evaluate the merits of the Claim;

f. Provide to Royal a copy of the Claim file and periodic narrative reports on the status of each Claim reportable in accordance with Exhibit B and Royal's guidelines and instructions

g. Perform all administrative work in connection with the Claims including the preparation of checks or drafts drawn on the Claim Payment Fund established for that purpose;

h. Provide Royal and excess insurers with any reports they may reasonably require in a timely manner;

i. Respond to any inquiry, complaint or request received from an insurance department, other regulatory agency, insured, claimant, or any other interested party;

j. Provide information and assistance to Royal and Our Insured as may be reasonably required for preparation and filing of all reports required by any state;

k. Adjust, settle or defend all Claims within the discretionary settlement limit of the Service Company as

set out in Exhibit B and adust, settle or defend all Claims in excess of the settlement limit with the express prior approval of Royal;

l.     Monitor the treatment programs recommended to a claimant by any health care provider in accordance with industry standards;

m.     Attend and handle, where permitted by law, informal hearings and pre-hearing conferences;

n.     Pursue all possibilities of subrogation, contribution or indemnity for Royal or the Insured; and

o.     Adhere to the File Retention and Destruction Schedule set out in Exhibit B.

See Docket No. 130-4 at 12-13.

Sedgwick, the third-party administrator, acting under contract with Nash Finch, provided the claims administration.  According to the agreement, Sedgwick processed paperwork, investigated claims, obtained medical reports, monitored treatment programs recommended by health care providers, verified coverage, adjusted, settled and defended claims, and paid medical bills with checks written on its own account.  See id.  Through performing these types of services, Sedgwick "effectively delivered the workers' compensation benefits and took many of the same steps necessary to perform the employer's duty of good faith and fair dealing owed to the claimants."  See Johnson, 821 P.2s at 812.

Furthermore, based on the claims service agreement, it is clear that Sedgwick would have been aware that it was instrumental in carrying out Nash Finch's duties to workers' compensation claimants.  The role that Sedgwick

played in this case is nearly identical to the roles that the third-party administrators played in <u>Johnson</u>, <u>Cary</u>, <u>Dellaira</u>, and <u>Eves</u>.  "An entity that controls the claim determination process may have an incentive similar to that of an unscrupulous insurer to delay payment or coerce an insured into a diminished settlement." <u>Dellaira</u>, 102 P.2d at 115.

Other jurisdictions have also held that third-party administrators, in addition to performing the tasks of an insurance company, must have some financial incentive associated with the claims processing before making a finding that they could be liable for bad faith.  <u>See</u> <u>Cary</u>, 68 P.3d at 468 (noting the third-party administrator "had a significant financial incentive to delay payment"); <u>Dellaria</u>, 102 P.3d at 115 (adopting the same reasoning in <u>Cary</u>); <u>Eves</u>, 2010 WL 749925 at *3 (adopting the reasoning of <u>Cary</u> and <u>Dellaria</u>).  Nash Finch and Sedgwick assert that Sedgwick did not have any financial incentive to delay payment because "[w]hether Sedgwick paid Fair's claim or denied Fair's claim, [Sedgwick] got paid the same." <u>See</u> Docket No. 116 at 10.

The service agreement between Nash Finch and Sedgwick indicates that Sedgwick, for the year 2010 would receive $443 per claim for any takeover indemnity claim Sedgwick administered from Royal & Sun.  Thus, Sedgwick asserts that, unlike cases where the third-party administrators fees were tied to the percentage of premiums paid or where third-party administrators shared

in the risk of loss, Sedgwick was paid the same regardless of the outcome of the claim.

Although Sedgwick was paid a flat fee for administering the takeover claims, Sedgwick had a financial incentive to reduce Nash Finch's costs. Sedgwick instituted the performance metric program with the intent of achieving a 10% reduction in the average cost of indemnity and medical only claims for 2009 when compared to 2008 costs. Ms. Fair asserts, and Nash Finch does not deny, this program saved Nash Finch $446,667 in February 2009, and $670,236 in October of 2009.[21] See Docket No. 109 at 17. The court is unaware whether Sedgwick received some type of bonus related to these costs savings. However, even if no bonus was received, Sedgwick had a financial incentive to reduce Nash Finch's costs. Certainly Nash Finch would not continue to employ a third-party administrator who is not focused on reducing costs; Sedgwick thus had an incentive to reduce costs in order to garner additional business and continue as the third-party administrator.[22]

_____

[21] These numbers were based on information provided by Sedgwick during Sedgwick's Rule 30(b)(6) deposition. See Docket No. 111-9 at 3. Total savings amounts were not provided for every month, however, in October of 2009 when Nash Finch saved approximately $670,236, there was a 26% reduction in costs as compared to October of 2008. In September of 2009, the reduction was 30.5%, in November of 2009, the reduction was 30.0% and, in December of 2009, the reduction was 27.9%, as compared to the same months in 2008. See Docket No. 58-21.

[22]In addition, the court notes that the more quickly Sedgwick employees disposed of claims, the more claims an individual employee could handle. If

Based on these facts, the court finds that Sedgwick was fulfilling nearly all the functions normally performed by an insurance company in processing claims and determining whether to deliver insurance benefits. Additionally, the court finds that Sedgwick had an incentive, similar to that of a "unscrupulous insurer to delay payment." Therefore, the court finds that Sedgwick owed Ms. Fair a duty of good faith and fair dealing when administering her workers' compensation claims even in the absence of contractual privity with Ms. Fair.[23]

## 2. Whether Sedgwick is Liable as an Agent of Nash Finch

Ms. Fair asserts that Sedgwick is liable as Nash Finch's agent for any tort committed while acting on behalf of the principal. The Second Restatement of Agency states:

---

one's business model is to be paid a flat fee for each claim handled, one would maximize one's profit by disposing of claims quickly, and thus maximizing the number of claims per employee that could be handled. To analogize to the law business, a lawyer can handle many more clients if each client requires only a single court appearance before concluding the case. If each client's case requires intensive effort and many court appearances, however, the number of clients a single lawyer can handle would be reduced.

[23] In <u>Torres v. Travelers Ins. Co.</u>, Civ. 01-5056, Docket No. 253 at 24 (D.S.D.) Chief Judge Karen Schreier included the following in her jury instruction:

> FINAL INSTRUCTION NO. 9 – THIRD PARTY ADMINISTRATOR
> An Insurance company cannot relieve itself of its obligation of good faith and fair dealing by contracting out its responsibilities to a third party administrator, and *in cases where the third party administrator commits acts of bad faith, both the claims administrator and the insurance company that is responsible for paying the claim can be held liable.*

(emphasis added).

> [a]n agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal, except where he is exercising a privilege of the principal, or a privilege held by him for the protection of the principal's interest, or where the principal owes no duty or less than the normal duty of care to the person harmed.

Restatement (Second) of Agency, § 343 (1958).

The South Dakota Supreme Court has stated that while it is not bound by the Restatement, it has "found its reasoning persuasive in many instances." Chem-Age Indus., Inc. v. Glover, 2002 S.D. 122, ¶ 33, 652 N.W.2d 756, 770. Here, the court has already determined that Nash Finch was self-insured for the first $500,000 per occurrence and Nash Finch hired Sedgwick to administer its workers' compensation claims. Nash Finch is Sedgwick's principal. Thus, Sedgwick, in performing the administration of Nash Finch's workers' compensation claims, was acting as an agent to Nash Finch and can be held liable as such.

Bad faith in South Dakota has two elements. A plaintiff must prove: (1) that a claim was denied or benefits withheld without a reasonable basis; and (2) the knowledge or reckless disregard of the lack of a reasonable basis for the denial. Stene v. State Farm Mut. Auto. Ins. Co., 583 N.W.2d 399, 402 (S.D. 1998); Walz v. Fireman's Fund Ins. Co., 556 N.W.2d 68, 70 (S.D. 1996).

As discussed above in relation to Nash Finch's liability, the parties dispute the facts regarding the handling of Ms. Fair's claim and exactly why the Wound Care bills were not being paid. Nash Finch asserts that Ms. Jesperson,

the claims adjuster for Ms. Fair's workers' compensation claim, merely made a mistake by not carefully reading correspondence from Ms. Fair's attorney regarding Ms. Fair's treatment at Wound Care.   Nash Finch places the blame on Ms. Fair's attorney who directed Wound Care to bill Medicare.

Ms. Fair asserts that Ms. Jesperson was made aware by e-mail that Ms. Fair was being treated again for a recurrence of her prior injury.  The e-mail to Ms. Jesperson indicated that Ms. Fair was treating at both Rapid Care and Wound Care.  Thus, although Ms. Fair's attorney did not directly tell Ms. Jesperson that he instructed Wound Care to bill Medicare until the insurance issue was resolved, Ms. Fair asserts that Ms. Jesperson was aware that Ms. Fair was in fact treating at two facilities.

In response to why she never took action to correct the billing issue, Ms. Jesperson gives conflicting explanations.  She asserts that she did not read her e-mail close enough to realize that Ms. Fair was treating at two separate facilities and therefore assumed that Ms. Fair was only treating at Rapid Care. Ms. Jesperson also asserts that she believed Rapid Care and Wound Care to be the same facility.

Ms. Jesperson's credibility as to why the bills were not being paid or handled in the appropriate manner is a question for the jury.  "In a ruling on a motion for summary judgment a court must not weigh evidence or make credibility determination." Kenny, 347 F.3d at 1044 (referencing Anderson,

477 U.S. at 255 ("credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when she or] he is ruling on a motion for summary judgment....")).

The questions surrounding the billing issue regarding Ms. Fair's treatment at Wound Care is a question for the jury. When viewing the facts in the light most favorable to Ms. Fair, there are issues of material fact which preclude summary judgment in favor of Nash Finch.

The parties also dispute whether the performance metric program that Sedgwick initiated in 2009 was improper. The defendants assert that the performance metric initiated by Sedgwick related only to closed claims, which necessarily excluded Ms. Fair's open claim. Additionally, several Sedgwick employees--Ms. Adams, Ms. Weingart, and Mr. Oertli--all indicate that the purpose of the performance metric program was only to ensure that Sedgwick employees were following Sedgwick's best practices and reducing costs by using proper processes for administering claims and using networks available to Sedgwick.

Ms. Fair asserts that the program initiated by Sedgwick and Nash Finch put pressure on Ms. Jesperson and other Sedgwick employees to reduce costs. Sedgwick singled out those employees who were succeeding under the program, as well as those employees who were not. The e-mails sent out by Ms. Adams, whether relating only to closed claims or all claims, clearly indicate

Sedgwick's goals of reducing costs by 10%. Additionally, the e-mails illustrate the effort that Sedgwick was putting into the program: "[w]e will review at the end of each calendar quarter (April, July, October, and January) and recognize the claim team who has the highest percentage of cost reduction" (Docket No. 58-15); "I am going to begin monitoring medical only claims open longer than 90 days and indemnity claims open longer than 6 months. If I have questions I will start sending an email to the examiner and supervisor. We need to move some of these claims to closure." (Docket No. 58-18). It is apparent there was some pressure being exerted on Sedgwick employees to reduce costs. Viewing these facts in the light most favorable to Ms. Fair, there is an issue of material fact as to whether the program improperly motivated claims handling. Thus, there are material facts regarding Sedgwick's handling of the claim that preclude summary judgment.

### 3. Whether Sedgwick is Liable for Aiding Abetting

Ms. Fair also asserts that Sedgwick is liable under a theory of aiding and abetting. The South Dakota Supreme Court in Chem-Age noted that "one who gives advice or encouragement to a tortfeasor is also a tortfeasor." 2002 S.D. at ¶ 41, 652 N.W.2d at 774 (citing Restatement (Second) of Torts § 876 cmt b (1979). See also Berg v. Johnson & Johnson, 2010 WL 3806141, *5 (D.S.D. 2010) (citing Chem-Age and Restatement (Second) of Torts § 876 in denying a

motion to dismiss the claim that two defendants acted in concert in causing harm to the plaintiff).

Again, in <u>Chem-Age</u>, 2002 SD at 46, 652 N.W.2d at 775, the South Dakota Supreme Court held that to establish a cause of action for aiding or assisting in the breach of a fiduciary duty, a plaintiff must prove: "(1) the fiduciary breached an obligation to plaintiff; (2) defendant substantially assisted the fiduciary in the achievement of the breach; (3) defendant knew that the fiduciary's conduct constituted a breach of duty; and (4) damages were sustained as a result of the breach." <u>Id.</u> at ¶ 46, 652 N.W.2d at 775.

Ms. Fair asserts that the evidence shows that Sedgwick enacted the performance metric program to reduce Nash Finch's costs by a target of 10% and that Nash Finch was well aware of the program and the measures that Sedgwick was using to enforce its program. There are questions of material fact relating to the handling of Ms. Fair's workers' compensation claim. Nash Finch was receiving the e-mails from Sedgwick regarding the performance metric program and was aware of Sedgwick's goal of reducing costs by 10%. A question of material fact exists as to whether that program improperly motivated claims handling. This question goes directly to whether Sedgwick and Nash Finch breached an obligation to Ms. Fair and whether the defendants substantially assisted each other in achieving the breach of the duty of good faith. Therefore, there are material facts that preclude summary judgment.

## CONCLUSION

For the reasons stated above, the court finds that, beginning in 2004, Nash Finch was self-insured for the first $500,000 per occurrence and that Nash Finch therefore owed a duty of good faith to Ms. Fair.  When viewing the facts in the light most favorable to Ms. Fair, the court finds that there are questions of material fact as to whether Nash Finch breached its duty of good faith to Ms. Fair, whether Nash Finch can be held vicariously liable for Sedgwick's actions, and whether Nash Finch can be held liable for aiding and abetting Sedgwick's actions.  Therefore, the court recommends denying Nash Finch's motion for summary judgment [Docket No. 96].

In addition, the court finds that Sedgwick, as the third-party administrator, owed a duty of good faith and fair dealing in administering Ms. Fair's workers' compensation claim.  Questions of material fact exist as to whether Sedgwick breached this duty, whether Sedgwick as Nash Finch's agent is liable for the actions of Nash Finch, and whether Sedgwick aided and abetted Nash Finch's actions.  Therefore, the court recommends denying Sedgwick's motion for summary judgment [Docket No. 96].

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.  See also Fed. R. Civ. P.

72(b)(2).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require *de novo* review by the district court.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

      Dated October 30, 2012

                  BY THE COURT:

                  /s/ *Veronica L. Duffy*

                  VERONICA L. DUFFY
                  UNITED STATES MAGISTRATE JUDGE