UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| ANNA FAIR, | ) | CIV. 11-5005-JLV |
| | ) | |
| Plaintiff, | ) | ORDER OVERRULING |
| | ) | DEFENDANTS' |
| vs. | ) | OBJECTIONS AND |
| | ) | ADOPTING REPORT |
| NASH FINCH COMPANY and | ) | AND RECOMMENDATION |
| SEDGWICK CMS, | ) | |
| | ) | |
| Defendants. | ) | |

Pending before the court is defendants' motion for summary

judgment.  (Docket 96).  The court referred the motion to Magistrate Judge

Veronica L. Duffy for resolution.  (Docket 105).  On October 30, 2012,

Magistrate Judge Duffy filed a report recommending the court deny defendants'

motion for summary judgment.  (Docket 134).  Defendants timely filed

objections.  (Docket 135).  Plaintiff filed a response to defendants' objections.[1]

(Docket 136).

The court reviews *de novo* those portions of the report and

recommendation which are the subject of objections.  Thompson v. Nix, 897

F.2d 356, 357-58 (8th Cir. 1990); 28 U.S.C. § 636(b)(1).  The court may

then "accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

_____

[1]Fed. R. Civ. P. 72(b)(2) allows a party to respond to an opposing party's
objections.

For the reasons stated below, defendants' objections are overruled.  The court adopts the report and recommendation of the magistrate judge in its entirety.

**A.     MAGISTRATE JUDGE'S FINDINGS OF FACT**

Defendants' objections to the magistrate judge's findings of fact are:

1.     Christine Jesperson's testimony did not create an issue of fact for the jury; and

2.     The performance metrics have absolutely nothing to do with Ms. Fair's claim.

(Docket 135 at pp. 14-20).  Resolution of defendants' objections will reference only those facts necessary to provide context.  The court adopts all other facts in the report and recommendation.  28 U.S.C. § 636(b)(1)(C).

**1.     CHRISTINE JESPERSON'S TESTIMONY DID NOT CREATE AN ISSUE OF FACT FOR THE JURY**

The defendants argue "[t]he record is devoid of evidence that demonstrates an intent on the part of Christine Jesperson to deny or fail to process the Wound Care bills."  (Docket 135 at p. 15).  "There was no intentional denial or failure to process or pay a claim, and the Magistrate relied on speculation and innuendo, not evidence, in concluding otherwise."  Id.

Contrary to defendants' objection, the report and recommendation properly found a factual issue existed as to Ms. Jesperson's testimony.  On different occasions, Ms. Jesperson testified:

2

> [She] did not read the communications that came through Royal & Sun's attorney carefully enough to realize that Fair was treating at two facilities, Wound Care and Rapid Care Clinic; and
>
> [She] did not know that RapidCare Clinic was different than Wound Care.

(Docket 99 at ¶¶ 33 & 36).  These statements are "conflicting explanations" as to why Ms. Jesperson did not promptly resolve the billing issue.  (Docket 134 at p. 38).

Defendants correctly state the law on the proof required to sustain a bad faith claim.  (Docket 135 at p. 16) (citing Isaac v. State Farm Mut. Automobile Insurance Co., 522 N.W.2d 752, 759 (S.D. 1994) ("Bad faith actions . . . must be predicated on more than the negligence of another.").  Whether there was an intentional denial or negligent failure to pay the claim involves "Ms. Jesperson's credibility . . . [and] is a question for the jury."  (Docket 134 at p. 38).  "Assessing the credibility of witnesses and evaluating the weight to assign to their testimony is the job of the fact-finder, and is not a function for the court on a motion for summary judgment."  United States v. Dico, Inc., 136 F.3d 572, 579 (8th Cir. 1998).  Defendants' objection is overruled.

## 2.   THE PERFORMANCE METRICS HAVE ABSOLUTELY NOTHING TO DO WITH MS. FAIR'S CLAIM

Defendants object to the magistrate judge's consideration of the performance metrics and the findings of fact generated from that analysis.  (Docket 135 at pp. 16-17).  Defendants argue: "First and foremost, the

performance metrics and figures reported in Adams' emails concern statistics related to *closed claims*." Id. at p. 17 (emphasis in original).  Defendants' position is simply illogical.

Nancy Adams was the Director of Client Services for Sedgwick.  (Docket 134 at p. 13).  Ms. Adams' e-mail in January of 2009 "explained that Sedgwick was setting a goal of a 10% reduction in the average cost of indemnity and medical only claims for 2009 when compared to 2008 costs."[2]  Id.  In February, Ms. Adams sent out another e-mail stating "[i]n January overall we exceeded the 100% closing ratio goal." Id. at pp. 13-14.  She encouraged Sedgwick employees to figure out how to close more pending claim files.  Id. at p. 16.  Throughout a number of subsequent e-mails, Ms. Adams praised certain Sedgwick claim centers for reducing the average cost of indemnity claims and medical only claims.  Id. at p. 16.  In 2009, the year critical to Ms. Fair's claim, Sedgwick was able to reduce its Nash Finch workers' compensation claims files every month when compared to 2008.  Id.  It is undisputed, "this program saved Nash Finch $446,667 in February 2009, and $670,236 in October of 2009." Id. at p. 70.  It is disingenuous for the defendants to suggest the money was saved because Sedgwick only examined closed files.

---

[2]The e-mail was sent to Cindy Weingart and David Oertli, Sedgwick employees, and to Patty Nylin and Beth Iacono, Nash Finch employees. (Docket 134 at p. 13 n. 1).  These individuals were included in each of the subsequent e-mails discussed.

Whether Sedgwick's goal was to "to drive claims to final resolution quickly by getting injured workers the proper treatment and returning them to work as quickly as possible[]" is a jury question.  (Docket 135 at p. 20).  A jury also must decide how much weight, if any, to give the performance metric evidence in analyzing Ms. Fair's bad faith claim.  Dico, Inc., 136 F.3d at 579.  The magistrate judge properly set forth the questions of material fact a jury must consider in resolving the parties' dispute.  Defendants' objection is overruled.

**B.    MAGISTRATE JUDGE'S CONCLUSIONS OF LAW**

Defendants' objections to the magistrate judge's conclusions of law are:

1.    The Magistrate erred in concluding Nash Finch was self-insured and therefore owed a duty of good faith and fair dealing.

2.    The Magistrate erred in concluding that third-party administrators such as Sedgwick owe a duty of good faith and fair dealing.

3.    Because the Magistrate incorrectly decided the "duty" issues, the Magistrate's conclusions regarding the applicability of aiding and abetting and agency theories were also erroneous.

(Docket 135 at pp. 1-14).  Each objection will be addressed separately.

**1.    THE MAGISTRATE ERRED IN CONCLUDING NASH FINCH WAS SELF-INSURED AND THEREFORE OWED A DUTY OF GOOD FAITH AND FAIR DEALING**

The magistrate judge made the following preliminary findings of fact:

1.    For the policy period beginning on January 1, 2003, and extending to January 1, 2004, Nash Finch Company

5

purchased workers' compensation insurance from Royal & Sun.

2.    Under this agreement, Nash Finch would be responsible for the first $500,000 in any single workers' compensation claim made by an employee.

3.    [U]nder the Royal & Sun policy, the obligation to pay workers' compensation benefits was to remain with Royal & Sun, who was then to seek reimbursement from Nash Finch for any amount that would have been covered under the policy deductible.

4.    In 2004, Nash Finch switched to an unbundled program with Zurich-American Insurance Group ("Zurich") . . . .

5.    After Nash Finch switched to Zurich to provide insurance coverage under an unbundled program, Nash Finch hired and signed an agreement with Sedgwick in which [it] would act as the third-party administrator.

6.    During this switch, the open workers' compensation claims, or "Takeover Claims," currently being handled by Royal & Sun were transferred to Sedgwick to be handled by [it] going forward.

7.    Royal & Sun sent a "Notification of Claim Transfer" to Nash Finch that indicated that Royal & Sun's coverage for Nash Finch expired on January 1, 2004, and that Royal & Sun, per Nash Finch's request, would transfer all open workers' compensation claims as well as claims closed in the past twelve months to Sedgwick.

8.    Ms. Fair's claim was included in these takeover claims.

9.    After January 1, 2004, Sedgwick was responsible for administering the Royal & Sun Takeover Claims, including Ms. Fair's claim.

10.    [After 2004] Sedgwick dealt directly with Nash Finch in administering Ms. Fair's claims.  No insurance company was involved, no insurance company made payments to

> Ms. Fair's medical providers, and there was no
> reimbursement made.  Rather, Nash Finch directly paid
> . . . the benefits owed to Ms. Fair.

(Docket 134 at pp. 9-12, 29-30) (quotation marks omitted).

With those findings, the magistrate judge made the following preliminary

conclusions of law:

1.　After the takeover claims were transferred, Royal & Sun remained responsible for [Ms.] Fair's claim, but the method of payment of the claims changed.  Instead of Royal & Sun paying the claims initially, subject to reimbursement by Nash Finch, Nash Finch essentially paid the claims directly by giving Sedgwick the money necessary to do so in a deposit account.

2.　Prior to 2004, it is clear that Royal & Sun retained the risk of loss.　Royal & Sun, or their third-party administrator, paid the bills associated with a claim pursuant to the insurance agreement and then sought reimbursement from Nash Finch for amounts up to the deductible.

3.　[P]rior to 2004, Nash Finch was not self-insured . . . .

4.　Based on the arrangement that Nash Finch had with Sedgwick, it is clear that Nash Finch retained all or a substantial risk under its workers' compensation policy.

Id. at pp. 12, 26, 27 & 31.

The magistrate judge then analyzed South Dakota law and made the

following ultimate conclusions of law:

1.　Although Nash Finch has not complied with SDCL § 62-5-10, the arrangement with Royal & Sun and Sedgwick after . . . 2004 indicates that, in fact, Nash Finch was self-insured for workers' compensation claims up to $500,000.

7

    2.      Nash Finch was [after 2004] self-insured for all workers' compensation claims up to $500,000, and was, for all practical purposes the primary insurer.

    3.      Nash Finch owed a duty of good faith to Ms. Fair in administering her workers' compensation benefits.

Id. at pp. 32 & 35.

Defendants acknowledge the magistrate judge "correctly summarized the arrangement under the unbundled Zurich policy as to claims occurring in 2004 and going forward . . . ." (Docket 135 at pp. 4-5). Defendants object to the magistrate judge's ultimate conclusion of law that Nash Finch was self-insured after 2004: "Notwithstanding the way Sedgwick, Nash Finch, and Royal elected to handle payments within Nash Finch's deductible logistically from 2004 going forward, the contractual and statutory obligation to pay workers compensation benefits remained always with Royal." Id. at p. 4. Defendants objection is that "nothing changed when Nash Finch went to an unbundled program with Zurich in 2004." Id. at p. 5.

The court finds the report and recommendation to be an accurate development of the facts and a correct application of South Dakota law. Nash Finch did not comply with SDCL § 62-5-10 to qualify as a self-insurer. As a consequence, state law does not shield Nash Finch from being classified as a self-insurer. The court finds Judge Duffy's legal analysis to be well-reasoned and defendants' objection to be unpersuasive. Defendants' objection is overruled.

2.    **THE MAGISTRATE ERRED IN CONCLUDING THAT THIRD-PARTY ADMINISTRATORS SUCH AS SEDGWICK OWE A DUTY OF GOOD FAITH AND FAIR DEALING**

The South Dakota Supreme Court has not decided whether a claims administrator has a duty of good faith and fair dealing. (Dockets 134 at p. 46 & 136 at p. 56). In analyzing how the South Dakota Supreme Court would likely rule on this issue, defendants argue the magistrate judge "incorrectly concluded that the South Dakota Supreme Court would follow the reasoning of the Colorado Supreme Court in Scott Wetzel Servs., Inc., v. Johnson, 821 P.2d 804 (Colo. 1991), and Cary v. United of Omaha Life Ins. Co., 68 P.3d 462 (Colo. 2003)." (Docket 135 at p. 6). The defendants also object to the magistrate judge's analysis distinguishing Gilchrist v. Trail King Industries, Inc., 612 N.W.2d 10 (S.D. 2000). Id. at p. 9. Instead, defendants argue Gilchrist "implies that South Dakota would not recognize a bad faith claim against Sedgwick under the facts of this case." Id.

The court adopts the magistrate judge's analysis of Scott Wetzel Services, Inc., Cary, and Gilchrist. In Gilchrist, the South Dakota Supreme Court examined the proof required for a third party to be liable under a bad faith claim. "Whether an employer's rehabilitation consultant [a third party administrator] can be held liable to a workers' compensation claimant for bad faith is a question of first impression in South Dakota. In the insurance context, an insurer's violation of its duty of good faith and fair dealing may give

9

rise to the tort of bad faith. . . . Analogously, to establish bad faith against a workers' compensation rehabilitation consultant there must first be a showing that the rehabilitationist owed a duty to the injured worker." <u>Gilchrist</u>, 612 N.W.2d at 15.  After analyzing case authority in Illinois and Indiana, the South Dakota Supreme Court stated "if the worker had been able to establish that the rehabilitation company had caused the worker additional injuries then public policy would dictate that the worker be compensated.  We find these authorities persuasive." <u>Id.</u> at 16.

Sedgwick was performing tasks very similar to the third party administrator in <u>Scott Wetzel Services, Inc.</u>  Sedgwick "processed the paperwork, investigated the claim[], obtained medical reports, made initial determinations of a claimant's eligibility for benefits, and paid medical bills with checks written on its own account."[3] <u>Scott Wetzel Services, Inc.</u>, 821 P.2d at 812.  "Through performing these services, [Sedgwick] effectively delivered the workers' compensation benefits and took many of the steps necessary to perform the employer's duty of good faith and fair dealing owed to the claimant[]." <u>Id.</u>  Similarly, in <u>Cary</u>, the third party administrator "fulfilled virtually all of the functions normally performed by an insurance company in processing claims and determining whether to deliver insurance benefits."

---

[3]Nash Finch funded Sedgwick's account just as Safeway funded the account used by Scott Wetzel Services, Inc.  <u>Compare</u> Docket 134 at pp. 28-30 and <u>Scott Wetzel Services, Inc.</u>, 821 P.2d at 806.

Cary, 68 P.3d at 468.  Finally, because of its contractual relationship with
Nash Finch, Sedgwick "had a significant financial incentive to delay payment of
benefits . . . ."[4]  Id.

The defendants object to the magistrate judge's decision to reject the
analysis of Natividad v. Alexsis, Inc., 875 S.W.2d 695 (Tex. 1994).  (Docket 135
at p. 9).  Without repeating the magistrate judge's analysis of Natividad, the
court concludes that the South Dakota Supreme Court logically would look to
Colorado law rather than Texas law for guidance on third party administrator
bad faith liability.

This court is confident the South Dakota Supreme Court would conclude
a third party administrator like Sedgwick had a duty of good faith and fair
dealing with Nash Finch's workers' compensation claimants, including Ms.
Fair.  Granting defendants' alternative request to certify the question to the
South Dakota Supreme Court would only delay resolution of Ms. Fair's claim
unnecessarily.  Defendants' objection is overruled.

---

[4]If Sedgwick did not have a financial incentive in its relationship with
Nash Finch, why would Sedgwick engage in an analysis of files to challenge its
employees to achieve a reduction in claim expenses?  The answer is
obvious—to continue the contractual benefits paid by Nash Finch for
Sedgwick's services.

3.  **BECAUSE THE MAGISTRATE INCORRECTLY DECIDED THE "DUTY" ISSUES, THE MAGISTRATE'S CONCLUSIONS REGARDING THE APPLICABILITY OF AIDING AND ABETTING AND AGENCY THEORIES WERE ALSO ERRONEOUS**

Contrary to the defendants' third objection, the report and recommendation properly analyzes the law of agency. (Docket 134 at pp. 35-36 & 71-72). Similarly, the magistrate judge correctly concluded both Nash Finch and Sedgwick may be liable to Ms. Fair under a theory of aiding and abetting the tortious conduct of the other. Id. at pp. 41-43 & 75-76). See also Chem-Age Industries, Inc. v. Glover, 652 N.W.2d 756, 773 (S.D. 2002) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.") (citing Restatement (Second) of Torts § 876(b) (1977); also referencing SDCL § 15-8-11 (defining joint tortfeasor)). Whether Ms. Fair can prove either Nash Finch or Sedgwick were aiding or abetting allegedly tortious conduct of the other is a fact question which a jury will resolve. Defendants' objection is overruled.

## ORDER

Based on the above analysis, it is hereby

ORDERED that defendants' objections (Docket 135) to the report and recommendation are overruled.

12

IT IS FURTHER ORDERED that the report and recommendation (Docket 134) is adopted in full.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (Docket 96) is denied.

Dated March 25, 2013.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE

13